JACOB L. GUTTAG, Respondent, *v.* HYMAN SHATZKIN, Appellant.

*Landlord and tenant — ejectment — constitutionality of chapter 944 of Laws of 1920.*

*Guttag* v. *Shatzkin*, 194 App. Div. 509, reversed.

(Argued January 19, 1921; decided March 8, 1921.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the first judicial depart-

ment, entered December 24, 1920, which reversed an order of Special Term denying a motion by plaintiff for judgment on the pleadings and granted said motion. The action was in ejectment and alleged that the defendant was unlawfully and without permission of plaintiff in possession of an apartment in a building belonging to plaintiff and unlawfully withheld the same from plaintiff's use. Defendant demurred on the ground that the complaint did not state facts sufficient to constitute a cause of action.

The following questions were certified: 1. Are the facts set forth in the complaint sufficient to constitute a cause of action? 2. Is chapter 947 of the Laws of 1920 constitutional? 3. Has the Supreme Court jurisdiction of the cause of action attempted to be set up in the complaint?

*David L. Podell, Martin C. Ansorge, Benjamin S. Kirsh, J. J. Podell, Gilbert Ray Hawes* and *Julius D. Tobias* for appellant.

*Francis M. Scott, I. Maurice Wormser, Julius H. Zieser* and *Bernard S. Deutsch* for respondent.

Order of Appellate Division reversed and that of Special Term affirmed, with costs in this court and in Appellate Division, on opinion of POUND, J., in *People ex rel. Durham Realty Corp.* v. *La Fetra* (230 N. Y. 429); questions certified answered as follows: Nos. 1 and 3 in the negative; No. 2 in the affirmative.

CRANE, J.   I agree with much that has been said by POUND, J., in *People ex rel. Durham Realty Corporation* v. *La Fetra* and in his result but desire to add the following reasons for my own conclusion.

The late war caused the difficulty which the New York state legislature, by these laws, has sought to ameliorate in so far as applicable to the city of New York. In the exercise of the war powers the railroad facilities of the country were taken over by the federal government. Shipments of all material were restricted or prohibited and the labor market was depleted by the withdrawal of mechanics and laborers for government work or service

in the army and navy. In consequence no building of any account was done in the city of New York and the housing facilities at the close of the war were entirely inadequate to accommodate the people. The legislature had before it reports of investigating committees showing that rents had become exorbitant through unscrupulous and profiteering landlords, that as many as 100,000 families were threatened with eviction on the first day of October, 1920, with no place to go, and that families had become scattered. Apparently an emergency was created which called for immediate relief, not merely for comfort, but for the actual necessaries and decencies of life. The lawmakers had reason to believe that the homes, health and morals of about 500,000 people were at stake and that immediate action was required. No power to meet such an emergency existed unless it was possessed by the New York state legislature. Our government was not so effete as to be barren of relief. It suspended for a time the right to dispossess tenants, it proscribed exorbitant rentals.

If 100,000 families were suddenly on the streets of the great metropolis without shelter, the state in the exercise of its reserve power could compel their housing at a reasonable rental to be paid by themselves or by the state. Private property could for the emergency be commandeered. The legislature by the laws in question has simply prevented such a catastrophe by requiring landlords at reasonable rental to keep tenants until normal building conditions have returned.

The war brought into use powers not before so extensively used, but nevertheless always existing. The war power of Congress and the police power of the state are well-known functions of government. It is only their application to new difficulties which ever causes comment. As nations grow, powers must expand. Thus the war power suspended many things and regulated not merely the fighting forces, but nearly all economic activities. The railroads and telegraphs were taken over and intrastate rates established. ( *Northern Pacific Ry. Co. v. North*

*Dakota,* 250 U. S. 135; *Dakota Central Tel. Co.* v. *South Dakota,* 250 U. S. 163.) The maximum price of coal was fixed and the sale and distribution of food products controlled. (*U. S.* v. *Penn. Central Coal Co.,* 256 Fed. Rep. 703.) No surprise was shown when buildings were taken for government war agencies at a reasonable price, which of necessity meant the price the government was willing to pay. Necessity commandeered buildings for a fair return. The complete and undivided character of the war power of the United States is not disputable (*Northern Pacific Ry. Co.* v. *North Dakota, supra*) and is not confined to actual hostilities for it carries with it inherently the power to guard against the immediate renewal of the conflict or *to remedy the evils which have arisen from its rise and progress.* (*Hamilton* v. *Kentucky Distilleries & W. Company,* 251 U. S. 146, 161.)

The provision of the Federal Control Act (40 Stat. 458, sec. 14) that the United States may retain its possession of the railroads until eighteen months after the ratification of peace is an instance where the war powers were continued to enable readjustment and prevent disaster. And yet the war power affects contracts and property rights.

While the states are subject to the contract clause of section 10, article I and section 1, article XIV of the United States Constitution, the police power of the states may affect contracts and modify property rights without violation of these provisions. Conceding the health, safety and morals of its citizens to be involved and the circumstances to justify a proper interference by the state, neither the contract nor due process of law clause stand in the way. (*Union Dry Goods Co.* v. *Georgia Public Service Corporation,* 248 U. S. 372.) These sections of our Federal Constitution and the police power of the states harmonize and never conflict. The only question here is one of fact, not one of law; do the facts call into existence the power reserved to the states to legislate for the safety and health of the people. Within its sphere the police power of the states is not

unlike the war power of the nation. Both are rules of necessity, impliedly or expressly existing in every form of government, the one to preserve the health and morals of a community, the other to preserve sovereignty.

When, therefore, by reason of disordered conditions due to war and the federal war powers, the people of New York city could find no other homes than those they possessed and were threatened with ejectment or dispossess except upon payment of exorbitant rents, the state legislature had the power to stay any and all proceedings for a reasonable time — that is while the danger or peril lasted, and until readjustment took place, the owner receiving fair compensation meanwhile.

This is not a case, in my judgment, where the legislature has undertaken to regulate housing rates because such a business has become charged with a public interest. We are not called upon to express any opinion upon such a power. Circumstances due to war conditions have created a peril to life and health and with this the state has attempted to deal until the peril be passed. The laws are not effectual any longer than the necessity demands, which may be less than the two years prescribed.

Similar laws for emergencies have been passed before. (*American Land Co.* v. *Zeiss*, 219 U. S. 47, 60; *Bertrand* v. *Taylor*, 87 Ill. 235; *Bowditch* v. *Boston*, 101 U. S. 16; *Breitenbach* v. *Bush*, 44 Penn. St. 313; *Wilson* v. *New*, 243 U. S. 332; *Hoffman* v. *Charlestown Five Cts. Sav. Bank*, 231 Mass. 324; *Hasbrouck* v. *Shipman*, 16 Wis. 296.)

For these reasons the order of the Appellate Division must be reversed and that of the Special Term affirmed. The first and third questions certified are answered in the negative, and the second in the affirmative.

Concur: HISCOCK, Ch. J., HOGAN, CARDOZO, POUND and ANDREWS, JJ.; McLAUGHLIN, J., dissents on dissenting opinion in *Levy Leasing Co.* v. *Siegel* (230 N. Y. 634).