## JOHN H. BLAISDELL AND ANOTHER v. HOME BUILDING & LOAN ASSOCIATION.[1]

July 7, 1933.

No. 29,615.

[1] Reported in 249 N. W. 334.
Affirmed 290 U. S. 398, 54 S. Ct. 231, 78 L. ed. 255.

*George C. Stiles,* for appellants.

*Strong, Myers & Covell* and *Karl H. Covell,* for respondent.

*Harry H. Peterson,* Attorney General, *William S. Ervin* and *Matthias N. Orfield,* Assistant Attorneys General; *Leonard Eriksson,* and *Bryce E. Lehmann,* amici curiae, filed separate briefs in support of the contention that L. 1933, c. 339, is constitutional, and there was an oral argument by *William S. Ervin,* Assistant Attorney General.

*HOLT, Justice.*

Appellants presented a petition to the district court for an order extending the period of redemption under the provisions of L. 1933, p. 514, c. 339. The substance of the petition was that appellants owned a certain lot in Minneapolis, which was their homestead and of the reasonable value of $15,000; that appellants on May 1, 1931, executed and delivered their mortgage to respondent on said lot to secure the payment of a certain sum of money, which mortgage contained a valid power of sale by advertisement; that thereafter, by reason of circumstances beyond the control of appellants, default in the condition of the mortgage was made, and it was foreclosed by advertisement and sold to respondent on May 2, 1932, for $3,700.98; that the time of redemption will expire on May 2, 1933,

and that respondent is the owner and holder of the sheriff's certificate of sale on the foreclosure; that appellants have made earnest efforts to refinance the loan and redeem but have failed because of the economic depression which has existed throughout the state for the last three years; that unless the period of redemption be extended the property will be irretrievably lost to appellants; that the reasonable net income in normal times is $115 per month and that for the last year it has been only $37 per month; that the reasonable value of the property greatly exceeds the money due on the mortgage; that unless the time to redeem from the said sale be extended appellants will suffer the loss of their whole equitable interest in the property; and appellants prayed that the court grant a hearing to extend the period of redemption until May 1, 1935, that it determine the reasonable rental value of the property and direct and require appellants to pay all or such reasonable part of such rental value toward the payments of taxes, insurance, and interest on the mortgage indebtedness as to the court appears reasonable and just. On the hearing respondent objected to the introduction of any evidence on the ground that L. 1933, p. 514, c. 339, was unconstitutional in that it impaired the obligation of the mortgage contract, that it was special and class legislation, and not warranted under the police power of the state. The objection was sustained, and, appellants' motion for a new trial being denied, they appealed.

Appellants concede, as they must, that L. 1933, p. 514, c. 339, impairs the obligations of the mortgage contract. It is too long for insertion in an opinion. It is declared to be an emergency measure and is not to remain in operation beyond May 1, 1935. Its object is to authorize the district court to extend the time of redemption from mortgage foreclosure sales and execution sales of real estate, and, incidentally thereto, to withhold during that time the power of sale by advertisement and the right to deficiency judgments. That this is impairing the obligation of the mortgage contract and the rights of judgment creditors is settled by the following decisions: Heyward v. Judd, 4 Minn. 375 (483); Goenen v. Schroeder, 8 Minn. 344 (387); Carroll v. Rossiter, 10 Minn. 141 (174); Hillebert v.

Porter, 28 Minn. 496, 11 N. W. 84; O'Brien v. Krenz, 36 Minn. 136, 30 N. W. 458; Dunn v. Stevens, 62 Minn. 380, 64 N. W. 924, 65 N. W. 348; Bronson v. Kinzie, 1 How. 311, 11 L. ed. 143; Edwards v. Kearzey, 96 U. S. 595, 24 L. ed. 793; Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042, 41 L. ed. 93.

The only ground upon which L. 1933, p. 514, c. 339, can be sustained is that it is legislation in virtue of the police power of the state called into exercise because of "a public economic emergency" which the act declares exists in the state. Respondent concedes that under the police power the state may impair the obligations of contract. Courts have so held. State ex rel. Twin City B. & I. Co. v. Houghton, 144 Minn. 1, 174 N. W. 885, 176 N. W. 159, 8 A. L. R. 585; State ex rel. Beery v. Houghton, 164 Minn. 146, 204 N. W. 569, 54 A. L. R. 1012; Sligh v. Kirkwood, 237 U. S. 52, 35 S. Ct. 501, 502, 59 L. ed. 835; Price v. Illinois, 238 U. S. 446, 35 S. Ct. 892, 59 L. ed. 1400; Perley v. North Carolina, 249 U. S. 510, 39 S. Ct. 357, 63 L. ed. 735; Miller v. Schoene, 276 U. S. 272, 48 S. Ct. 246, 72 L. ed. 568. In Sligh v. Kirkwood, 237 U. S. 52, 59, 35 S. Ct. 501, 59 L. ed. 835, we find the following:

"The police power, in its broadest sense, includes all legislation and almost every function of civil government. Barbier v. Connolly, 113 U. S. 27, 5 S. Ct. 357, 28 L. ed. 923. It is not subject to definite limitations, but is co-extensive with the necessities of the case and the safeguards of public interest. Camfield v. U. S. 167 U. S. 518, 524, 17 S. Ct. 864, 42 L. ed. 260, 262. It embraces regulations designed to promote public convenience or the general prosperity or welfare, as well as those specifically intended to promote the public safety or the public health."

To what extent emergency legislation under the police power of the state may impair contract obligations or impinge on any constitutional provision has received exhaustive consideration in cases arising out of the so-called housing legislation in New York and in the District of Columbia. On all questions involved and decided therein the similarity or occasion for the emergency legislation and its effect in impairing the obligations of contract and in violating

the due process clause are so pointedly applicable here that we feel they should be followed. The opinion of Judge Pound in People ex rel. Durham R. Corp. v. La Fetra, 230 N. Y. 429, 130 N. E. 601, 604, 16 A. L. R. 152, and the concurring opinion of Judge Crane, expressed in Guttag v. Shatzkin, 230 N. Y. 647, 130 N. E. 929, go quite fully into every legal proposition now raised. Edgar A. Levy Leasing Co. Inc. v. Siegel, 230 N. Y. 634, 130 N. E. 923, decided on the opinion in the La Fetra case, was affirmed in 258 U. S. 242, 42 S. Ct. 289, 291, 66 L. ed. 595. We quote from Judge Pound's opinion the principles controlling in a case of this sort [230 N. Y. 440]:

"Whether or not a public emergency existed was a question of fact, debated and debatable, which addressed itself primarily to the legislature. That it existed; promised not to be presently self-curative, and called for action, appeared from public documents and from common knowledge and observation. If the law-making power on such evidence has determined the existence of the emergency and has, in the main, dealt with it in a manner permitted by the constitutional limitations upon legislative power, so far as the same affect the class of landlords now challenging the statutes, the legislation should be upheld. * * * The proposition is equally fundamental that the state may establish regulations reasonably necessary to secure the general welfare of the community by the exercise of its police power although the rights of private property are thereby curtailed and freedom of contract is abridged [citing authorities]. * * * Emergency laws in time of peace are uncommon but not unknown. Wholesale disaster, financial panic, the aftermath of war (Hamilton v. Kentucky Distilleries & W. Co. 251 U. S. 146, 161, 40 S. Ct. 106, 64 L. ed. 194), earthquake, pestilence, famine and fire, a combination of men or the force of circumstances may, as the alternative of confusion or chaos, demand the enactment of laws that would be thought arbitrary under normal conditions (Bowditch v. Boston, 101 U. S. 16, 18, 19, 25 L. ed. 980; American Land Co. v. Zeiss, 219 U. S. 47, 31 S. Ct. 200, 55 L. ed. 82). Although emergency cannot become the source of power, and although the

Constitution cannot be suspended in any complication of peace or war (Ex parte Milligan, 4 Wall. 2, 18 L. ed. 281), an emergency may afford a reason for putting forth a latent governmental power already enjoyed but not previously exercised."

The laws involved in the La Fetra case, 230 N. Y. 429, permitted tenants to retain possession after the expiration of the lease upon paying reasonable rent; and, where a lease had been entered for a fixed rent, upon the tenant's application that the stipulated rent was unreasonable or extortionate, he could have the rent reduced. The summary dispossessory remedy was temporarily withdrawn from the landlords. A somewhat similar housing or renting act was passed by congress for the city of Washington. The act of congress and the New York acts came before the Federal Supreme Court in Block v. Hirsch, 256 U. S. 135, 41 S. Ct. 458, 65 L. ed. 865, 16 A. L. R. 165, and Marcus Brown H. Co. Inc. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. ed. 877, affirming (D. C.) 269 F. 306, and were sustained by a five to four decision. Later cases arising from the same acts are Edgar A. Levy Leasing Co. Inc. v. Siegel, 258 U. S. 252, 42 S. Ct. 289, 66 L. ed. 595, and Chastleton Corp. v. Sinclair, 264 U. S. 543, 44 S. Ct. 405, 68 L. ed. 841. In the Siegel case the New York housing acts were again under attack on various constitutional grounds, but upheld, there being only three dissenters at that time. The proposition was there pressed that the relation of landlord and tenant [258 U. S. 246] "is a private one and is not so affected by a public interest as to render it subject to regulation by the exercise of the police power." But the court held the question foreclosed by the Marcus Brown H. Co. case, 256 U. S. 170, 41 S. Ct. 465, 65 L. ed. 877. Again it was contended that that case did not squarely present whether or not the housing acts impaired contract obligations, but the court [258 U. S. 249] in denying this contention, quotes from the Marcus Brown H. Co. decision [256 U. S. 198]:

"The chief objections to these acts have been dealt with in Block v. Hirsch, 256 U. S. 135, 41 S. Ct. 458, 65 L. ed. 865, 16 A. L. R. 165. In the present case more emphasis is laid upon the impairment of

the obligation of the contract of the lessees to surrender possession and of the new lease which was to have gone into effect upon October 1, last year. But contracts are made subject to this exercise of the power of the state when otherwise justified, as we have held this to be."

Several cases are cited to support the last proposition. It is, however, true that the dissenting justices deny that the cases sustain what the majority deduce from them. Even though the dissenting opinions in the Block and Marcus Brown H. Co. cases may appear more in harmony with past interpretation of constitutional provisions, this court should follow the principles established by the prevailing opinions therein. They, and the later cases above cited, hold that in an emergency the legislature under the police power of the state may temporarily withdraw a summary remedy given by statute for the enforcement of contract rights, provided some adequate remedy remains; that in a public emergency statutes may be enacted which impair temporarily the obligations of contract, provided they be such as the emergency reasonably demands and the impairment be no more than is just and equitable under the circumstances; and that whether such an emergency exists as justifies the exercise of the police power is primarily for the legislature, to whose judgment courts must give due weight; but the courts do possess the final authority to determine whether the emergency does in fact exist (Chastleton Corp. v. Sinclair, 264 U. S. 543, 44 S. Ct. 405, 68 L. ed. 841), and whether the legislation for its relief is just and reasonable (Lawton v. Steele, 152 U. S. 133, 14 S. Ct. 499, 38 L. ed. 385).

The main proposition upon which this law must rest is the existence of "a public economic emergency." True, the legislature in § 1 of the law declares that it exists, and a preamble of nine "whereases" seeks further to disclose the necessity for the law. It may be questioned whether an economic emergency should invoke the police power of the state to grant relief which impairs the obligations of contract. History reveals that when the constitution of the United States was adopted the economic depression or emergency was, if anything, more acute under then existing conditions than at pres-

ent; yet, notwithstanding, there was inserted in the document the prohibition against state legislation impairing contract obligations. Economic depressions may scarcely be called emergencies, for they occur frequently and with more or less severity. The extension of the period of redemption by the Kansas legislature was no doubt caused by one of these economic depressions, yet the court gave the subject of emergency legislation no consideration in Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042, 41 L. ed. 93, holding the law invalid because it impaired the obligation of contract. It may further be questioned as a fact whether there really is an emergency requiring legislative relief in the situation of mortgagor to mortgagee. As a rule, in times of great economic depression and great depreciation of real estate values, the mortgagee does not desire the land, and rather than take the land would be glad to grant longer extensions on better terms than the court would be authorized to give under this law. In a great many foreclosure sales and execution sales under the present depreciated values the right of redemption is of no value, and the owner will not use it even if funds were available. And, again, it may well be argued that legislation which impairs contract obligations defeats its purpose. ·It tends to withdraw from the borrower the funds which otherwise he might procure. Lenders will not loan their money in a state where the contract for its repayment may be impaired at the uncontrolled whim of its legislature. But, with these and other objections to the law which may be raised, we reach the conclusion that it must be sustained.

In addition to the weight to be given the determination of the legislature that an economic emergency exists which demands relief, the court must take notice of other considerations. The members of the legislature come from every community of the state and from all the walks of life. They are familiar with conditions generally in every calling, occupation, profession, and business in the state. Not only they but the courts must be guided by what is common knowledge. It is common knowledge that in the last few years land values have shrunk enormously. Loans made a few years

ago upon the basis of the then going values cannot possibly be replaced on the basis of present values. We all know that when this law was enacted the large financial companies which had made it their business to invest in mortgages had ceased to do so. No bank would directly or indirectly loan on real estate mortgages. Life insurance companies, large investors in such mortgages, had even declared a moratorium as to the loan provisions of their policy contracts. The president had closed banks temporarily. The congress, in addition to many extraordinary measures looking to the relief of the economic emergency, had passed an act to supply funds whereby mortgagors may be able within a reasonable time to refinance their mortgages or redeem from sales where the redemption has not expired. With this knowledge the court cannot well hold that the legislature had no basis in fact for the conclusion that an economic emergency existed which called for the exercise of the police power to grant relief.

But it is claimed that the emergency sought to be relieved by this law is a private matter between mortgagors and mortgagees or between owners of lands and their judgment creditors which is not of public concern so. as to justify the exercise of the state's police power. It is said the housing statutes for the cities of Washington and New York related to shelter or places to live—a matter involving public health, public morality, and public safety. Yet when those statutes came before the courts it was urged, and with perhaps as good reason as in the instant case, that they related to the private affairs between landlords and tenants in which the public was not interested. So here respondent asserts that whether title to lands passes to the mortgagees at any certain time between now and May 1, 1935, can be of no public concern. The title to lands, it is said, must rest in someone, and public welfare is not dependent upon whether it is in one individual or in another. To us it appears about as much of public concern whether numerous owners of homes and lands—providing the necessary shelter and means of livelihood—must lose them because a temporary, unforeseen economic depression prevents a redemption within the time the law or

contract permits as that certain tenants who are in possession shall remain in spite of the terms of the lease because of the temporary scarcity of available quarters. All would-be tenants could not be accommodated, and it would seem that as long as the landlords were willing to let all available room it was none of the public's concern who were accepted as tenants. But the courts found the emergency and its relief one of sufficient public interest to permit the police power of the state to impair the obligation of contracts. It appears to us that the economic emergency which now threatens the loss of homes and lands which furnish those in possession the necessary shelter and means of subsistence is equally as potent a cause for the enactment of L. 1933, p. 514, c. 339, under the police power of the state as the housing emergency was in Washington and New York, which the Supreme Court of the United States deemed sufficient for the enactment of the relief statutes for those cities. We have not overlooked the fact that Mr. Justice Holmes, who spoke for the majority in Block v. Hirsch, 256 U. S. 135, 41 S. Ct. 458, 65 L. ed. 865, 16 A. L. R. 165, and Marcus Brown H. Co. Inc. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. ed. 877, in Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 416, 43 S. Ct. 158, 67 L. ed. 322, 28 A. L. R. 1321, said that the cases mentioned went "to the verge" of what was permissible under the constitutional limitations. However, to us no more of public health or public welfare seems involved in the extension of the tenancy to certain tenants then in possession of shelter than in the extension of the occupation of homes, shelter, or means of subsistence to mortgagors and judgment debtors in possession. That the courts may doubt the wisdom of the law is no ground upon which to declare it invalid. It is to be presumed constitutional until the contrary appears beyond a reasonable doubt. 1 & 6 Dunnell, Minn. Dig. (2 ed. & Supp.) §§ 1605 and 8931.

It cannot be said that this law goes beyond what is reasonable to give relief in a temporary emergency. At the mortgagor's option the right to foreclose by advertisement may be withheld or rather changed into a foreclosure by action during the operation of the law, that is, up to May 1, 1935. The right to foreclose by action

remains intact. The right of redemption may be extended by the district courts to the date mentioned; but to do so the courts must determine the terms upon which such extension may be had, and during that period the rental value of the property must be applied upon the payment of taxes, insurance, and the debt. The condition that the mortgagor or the one obtaining the extension to redeem must meanwhile pay the rental value of the property goes far to giving compensation for the extension secured. The relief appears to be no more than what must be regarded as reasonable and just.

After this cause was submitted, on June 12, 1933, the supreme court of North Dakota filed its decision in State ex rel. Cleveringa v. Klein, — N. D. —, 249 N. W. 118, holding the act of that state extending the time of redemption from real estate mortgage foreclosure sales and real estate execution sales unconstitutional. The court said that no matter what the emergency might be the bill of rights in the state constitution prohibited the legislature from enacting any law impairing the obligations of private contract. And it further held that its law extending the time of redemption was forbidden by art. I, § 10 (impairing the obligations of contract) and § 1 of the fourteenth amendment (depriving of property without due process of law) of the federal constitution. We notice this difference between our law and that of North Dakota. The act of North Dakota extends the time of redemption unconditionally; while under our act the mortgagor, or the one who desires to avail himself of the extension, must pay the reasonable rental value of the property, during the period of extension, to the party holding the certificate of sale. It appears to us that this provision of our law may be held to provide compensation so that there is no taking of property without due process of law. However, there can be no doubt that in some degree our act, as well as that of North Dakota, impairs the obligations of the mortgage contract and hence runs counter to art. I, § 10, of the federal constitution. But our conclusion is that the legislature, under the police power of the state, has authority to enact laws to relieve a public emergency even though such laws temporarily impair obligations of contract, provided the

impairment is no more than reasonably necessary. To that extent the police power is supreme.

The law is challenged because of its title. Attention is called to the word "inequitable" therein. The word may be disregarded. It adds nothing except to suggest that perhaps there may be certain foreclosures where no equity whatever remains in the mortgagor, and hence those cannot be said to be inequitable so as to call for the interposition of relief. It is further claimed that the title embraces more than one subject. To us both title and act contain only one subject, viz. the extension of the time to redeem from involuntary sales of real estate under powers or under executions. All other provisions are ancillary or incidental thereto.

The law is said to contravene art. 4, § 33, of the state constitution forbidding special or class legislation. The law is general, applying to the whole state. The classification extends to all mortgage foreclosure sales and execution sales that had taken place and where title had not passed prior to the enactment, and also to sales in the future during the operation of the law—up to May 1, 1935. The temporary economic emergency affecting such mortgagors and judgment debtors justified the classification. That the law does not cover every case of owners of property who are affected by the economic depression or emergency does not condemn it. State v. Elliott, 135 Minn. 89, 160 N. W. 204; Miller v. Wilson, 236 U. S. 373, 35 S. Ct. 342, 59 L. ed. 628, L. R. A. 1915F, 829.

The order is reversed.

*WILSON, Chief Justice* (concurring).

I concur in all that Mr. Justice Holt has written. In addition thereto it seems to me that L. 1933, p. 514, c. 339, does little more than merely transfer our statutory foreclosure by advertisement into a foreclosure by action wherein the court has equitable powers to do substantially all the things which this act authorizes the court to do. Suring State Bank v. Giese, 210 Wis. 489, 246 N. W. 556.

This statute subjects the mortgagee to the rules of equity, but it also exacts equity in turn from the mortgagor as a condition under which he may have a longer time in which to redeem. If the mort-

gagor gets an extension of time in which to redeem he is required substantially to protect the mortgagee from loss by reason thereof. This he ought to do. While it temporarily protects the mortgagor from a loss of his title and a deficiency judgment, it takes so little away from the mortgagee that it cannot be said to invoke an unreasonable application of the police power, and under the authorities cited in State ex rel. Lichtscheidl v. Moeller, 189 Minn. 412, 249 N. W. 330, I am of the opinion that the statute should be sustained. Where the police power is involved we must all give. We cannot all receive only.

In my judgment every citizen should be encouraged in the spirit of achievement. If he is to be deprived of the happiness and satisfaction which he may find in achievements he becomes less useful to the community and society. Man is ambitious better to provide for those who by nature or law are dependent upon or entitled to his bounty. The law should protect him in his accumulations. It is best that the rash of ambition may develop on every person. If so, the public is interested in the solvency and prosperity of the people. It follows that it is detrimental to the public interest for our people to lose their valuable lands, improved or unimproved, at a time when the banks are closed and when it is impossible to find anyone who will make a mortgage loan. Funds are simply not available regardless of the security offered. The plight of the landowner has been enhanced because of the depreciation in land values resulting in many cases in the land being worth less than the mortgage. In such case the mortgagor can have no legislative help. Conditions are abnormal. To this situation the banks, acting under governmental requirements, have contributed by calling for liquidation to strengthen their own reserves.

As a rule mortgagees want their money, not land. Most of the real estate mortgages existing today were contracted when the general price level was about twice, and the farm values about four times, as high as today. It is estimated that mortgage foreclosures in the last three years aggregate about half a million in number. Farm mortgage debts amount to about nine billion dollars. But

in comparison to the number of defaults the number of foreclosures has not been large. There are authorities which in substance hold that "hard times" or "stormy weather" afford no basis for disturbing normal procedure. 42 Yale L. J. 960; 3 Jones, Mortgages (8 ed.) §§ 1583, 1695-1746. Perhaps we might find that Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042, 41 L. ed. 93, so held. But as time marched on that court later, in Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. ed. 865, 16 A. L. R. 165, and Marcus Brown H. Co. Inc. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. ed. 877, established a modern judicial doctrine. Indeed the opinion in Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042, 41 L. ed. 93, does not disclose the "stormy weather" then existing in Kansas, and it does not show that counsel even suggested that the statute was valid under the police power. There has always been a development in judicial construction to meet new and changing conditions, and Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042, 41 L. ed. 93, has been succeeded by the cases mentioned. As said by Mr. Chief Justice Greene in Hodges v. New England Screw Co. 1 R. I. 312, 356:

"The law is progressive and expansive, adapting itself to the new relations and interests which are constantly springing up in the progress of society."

The mortgagee is entitled to some protection during the interim of the extension, and this statute gives him that protection. These laws have been enacted in several of the states; and, while all courts do not agree, the modern judicial doctrine seems to sustain such legislation. An interesting and helpful discussion is found in 42 Yale L. J. 1236.

In considering what may be done under a statute we must presume that all courts will properly perform their duties.

Mortgagees have little to fear from this particular statute. Few of them would wish to deprive the mortgagor of an opportunity of getting his property out of a burning house. I insist that the courts can do very little for the mortgagor under this statute. The legislature so intended. If it had provided no compensation or protection incident to the extension I would have agreed to the conclusion

reached by the North Dakota court. I would then think the application of the police power was unreasonable. Our legislature acted cautiously and yet probably went as far as it could. In my judgment this statute is not a violation but a vindication of our form of constitutional government.

OLSEN, *Justice* (concurring).

L. 1933, p. 514, c. 339, does not appear to me to be as drastic and dangerous as stated in Justice Stone's dissenting opinion. It appears to be conceded that the legislature was confronted with an extraordinary emergency, and that, in such an emergency, the legislature may enact emergency laws vitally necessary for the welfare of the people of the state provided it does not thereby unreasonably impair the obligations of contracts or leave the contract holders without a reasonably adequate remedy on their contracts. The law has the effect of extending the time for redemption on mortgage and execution sales on mortgage debts. If it stopped with that the time extension until May 1, 1935, might be held unreasonable. But the act goes further and provides that, during the time so extended, the property owner must account for and pay to the mortgage holder the income from or rental value of the property, or such part thereof as the court finds to be just and equitable. In the case of farm property it may be necessary in some cases to devote a part of the income or rent to the upkeep of the farm; and in case of residence or business property it may be necessary to apply part of the rent or income for repairs. The mortgagee, in either case, has the benefit of having the property kept up, thereby protecting his security. The act does defer entry of deficiency judgments until the expiration of the redemption period, and does provide that the court may likewise extend the period of redemption from execution sales on judgments against mortgagors on the mortgage debt under the same conditions as on foreclosure sales. The act, as I read it, does not prevent the mortgagee from bringing suit on the notes or other evidence of indebtedness at any time.

Section 8 of the act further provides that the act shall not in any way permit any stay, postponement, or extension of time such that

any rights of the mortgagee might be adversely affected by a statute of limitations. See also part 2, § 5, of the act.

The law does extend the time within which a mortgagee may enforce his security, but on conditions which would seem to protect the mortgagee from any loss and which in the end may be as beneficial to him as to the mortgagor.

It is suggested that an emergency arising from a financial and business crisis does not authorize emergency laws in the exercise of the police power or for the protection of the public welfare, because financial and business crises are recurring events and to be anticipated; that an emergency, for legislative purposes, must be one arising from some extraordinary and unexpected catastrophe, such as floods, earthquakes, and other disturbances in nature. The reason why a flood or an earthquake may create an emergency is not because they are catastrophes of nature but because of their widespread destruction of the property and homes of thousands of people, causing want and suffering to a great number of people and injury and danger to public welfare. The present nation-wide and world-wide business and financial crisis has the same results as if it were caused by flood, earthquake, or disturbance in nature. It has deprived millions of persons in this nation of their employment and means of earning a living for themselves and their families; it has destroyed the value of and the income from all property on which thousands of people depended for a living; it actually has resulted in the loss of their homes by a number of our people and threatens to result in the loss of their homes by many other people in this state; it has resulted in such widespread want and suffering among our people that private, state, and municipal agencies are unable adequately to relieve the want and suffering, and congress has found it necessary to step in and attempt to remedy the situation by federal aid. Millions of the people's money were and are yet tied up in closed banks and in business enterprises.

To say that economic crises are to be anticipated is no good ground for making any distinction. Floods are recurring events, at least in the Ohio and Mississippi valleys. Earthquakes are recurring events, at least on the Pacific coast.

The test of an emergency is not the cause thereof but the resulting public want, suffering, and danger. The cause, whatever it may be, produces the emergency, but is not itself the emergency. A disease may be caused by a germ, but the germ is not the disease. The disease is the effect on the human body caused by the germ. So the present emergency is not the business and financial crisis, but the widespread loss, suffering, and want of a great number of the people of this state and the impairment of and danger to the public welfare. The situation presented to the legislature was of unprecedented magnitude, duration, and disastrous effect on the people. Prior economic disturbances in this state were of comparatively minor importance. Prior to 1880 we had comparatively few people affected by such crises. There was no widespread loss of employment or of homes. There were great unused natural resources and great opportunities for people to start anew and regain their losses. It is not so today. Such crises since that date up to the present have been of comparatively short duration and not very widespread or serious. Much more could be said on the subject, but I believe what has already been stated is entirely sufficient to show that the legislature was confronted with a vital crisis and was justified, if not required, in enacting any needed laws to relieve the situation under its police powers and for the public welfare of the state. In so doing the legislature had power to impair the obligations of contracts to a reasonable extent, provided it did not deprive the contract holder of a reasonably adequate remedy or remedies for the enforcement of his contract. Whether this law does unreasonably impair the obligations of contracts and whether it fails to provide or preserve to the contract holder a reasonably adequate remedy or remedies for the enforcement of his contract are the questions here presented.

The case of Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042, 41 L. ed. 93, is not in conflict with these views. There was no emergency and no question of police power or general welfare legislation considered in that case. The case supports the views herein expressed, that to render a law unconstitutional on the ground that

it impairs contract obligations the law must seriously impair such obligations or leave to the contract holder no adequate remedy for the enforcement of his contract.

*LORING, Justice* (concurring).

As I see the problem presented, the sole question involved is whether the police power of the state is paramount to the constitutional prohibition against the impairment of the obligations of a contract. If this were a case of first impression I should take the view that it is not. But in the New York housing cases the Supreme Court has twice said that it is. It is true that the matter of shelter was there held to be clothed with a public interest, justifying regulation under the then existing emergency; but it was also definitely held that the emergency justified the impairment of the obligations of leases made prior to the passage of the act under consideration. With the wisdom of such a holding, though by a divided court, it is not our function to quarrel. As long as it stands we must follow it. The other constitutional questions follow a like course.

That an economic emergency exists no one can deny. Whether the legislature has adopted the wisest remedy is not our problem. We may say only whether there is occasion justifying this exercise of the police power. I therefore concur.

*STONE, Justice* (dissenting).

I agree that L. 1933, p. 514, c. 339, is not constitutionally objectionable on account of anything contained, or not contained, in its title. But in my judgment, as to preëxisting mortgages and mortgage notes, it openly violates the due process and equal protection of law guaranties of both federal and state constitutions. All agree that it impairs the obligation of contracts. Its violation of both letter and spirit of constitutional guaranties being conceded, the effort to sustain it is based solely upon the assumption that it is, notwithstanding, legitimate exercise of police power in the emergency created by the present, long-continued, world-wide depression.

The contract rights involved are the power of sale found in all Minnesota mortgages and the right to collect the debt by action. The power may be exercised through foreclosure by suit or by

advertisement in the summary way provided by statute. 2 Mason Minn. St. 1927, § 9602, et seq. In that connection we have a line of decisions, establishing a rule of property, holding that the power to sell by advertisement, under the statute, is something more than mere matter of remedy. It is a substantive contract right protected by our constitutions against impairment. Heyward v. Judd, 4 Minn. 375 (483) ; Goenen v. Schroeder, 8 Minn. 344 (387) ; O'Brien v. Krenz, 36 Minn. 136, 30 N. W. 458, all in accord with Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042, 41 L. ed. 93.

Against that background of fact stands c. 339, consisting of two parts, aside from its preamble reciting the well known adverse economic conditions said to justify the law. The purpose in both parts is to permit mortgagors or their successors, in possession of mortgaged premises, to have both foreclosure and collection of judgment, if any, for the debt (part I, § 3.2) stayed until May 1, 1935, or for such shorter period as a court may direct. Section 4 even extends the period of redemption under mortgage foreclosures and execution sales already had. In any case the moratorium may be "for such additional time as the court may deem just and equitable but in no event beyond May 1st, 1935." The law makes no attempt to fix standards, or lay down rules, for the determination of what shall be "just and equitable." The only condition is that the applicant shall procure from the court "an order determining the reasonable value of the income on said property, or, if the property has no income, then the reasonable rental value of the property involved in such sale, and directing and requiring such mortgagor or judgment debtor, to pay all *or a reasonable part* of such income or rental value, in or toward the payment of taxes, insurance, interest, mortgage or judgment indebtedness at such times and in such manner as shall be fixed and determined and ordered by the court."

So, during the two-year period ending May 1, 1935, the law authorizes judges to make new contracts and substitute the same for the originals. They shall be "just and equitable"; otherwise the whole matter is left to the untrammeled discretion of the judge. The mortgagee, no matter how indulgent he has been nor how long

past due his debt, cannot even get all the income or rental value of the mortgaged property if some judge determines that it would be "reasonable" under the circumstances for him to do with less.

Toward the end of § 4 there is open invasion of judicial function by the lawmaking power, for it is declared that the time of redemption from recent foreclosures, even though by action, and from recent execution sales, shall be "and the same hereby is extended to a date 30 days after the passage * * * of this act," so that the debtor, if he wishes, may apply for and procure the legislative modification of a judicial decree which the law substantially directs. Finally, § 4 suspends until May 1, 1935, the mortgagee's right to a deficiency judgment. At least that right is postponed "until the period of redemption * * * as extended under the provisions of this act, has expired."

The framers of the act, doubtless sensing that they were covering a dangerously wide extent of territory by part I, enacted part II. Without going into its details, it is similar to part I, except that it applies "only to real estate occupied as a home exclusively by the person seeking relief or persons dependent upon him and to farm lands [area not limited] used by the person seeking relief as his principal means of furnishing necessary support to such person, his family and dependents." It applies only to cases not entitled to relief "under some *valid* provision of part I."

In the majority opinion no distinction is made between parts I and II. Part I sustained, there is small occasion to discuss part II. But so that I may not be misunderstood, let me say that my strong inclination would be to uphold a law, if we had such a one, and nothing more, subjecting for the period of the present emergency all sales of mortgaged property by advertisement to the closest judicial scrutiny, in order, as far as possible, to protect the equities of home owners, particularly the operating owners of farms, and temper the oppression and injustice sometimes perpetrated by mortgagees of the Shylock variety, now as always ready to take advantage of the letter both of the law and their bond. But part II of the act goes far beyond that. Equally with part I, it makes the whole subject a matter of judicial grace rather than judicial duty.

Going back to part I, I cannot find ground for declaring that mortgaged real estate of all kinds, and whatever its condition or use, is affected by public interest, even in the present emergency, so as to justify the exercise of police power in the manner attempted. As it stands, the law applies with the same force to vacant, idle, and even "wild" land as it does to any other. It embraces the very large acreage in this state of mortgaged lands which have been for some time and will doubtless long remain the subject of speculation and in the ownership, not of home owners or farmers, but of mere speculators. It applies as much to apartment house properties, office buildings, and other like investment properties, not occupied or used by the owners nor intended to be so used, but which are owned and dealt in as investment properties or for sheer speculation. How it comes that the public has any interest in staying foreclosures on such properties is beyond my comprehension. In many instances public interest would be better served by foreclosure, with the consequent squeezing out of speculative interests and inflated values.

It is no answer to say that, when a court is applied to in cases of mortgages on other than home, farm, or business property of the occupant, foreclosure may and doubtless will be permitted to proceed. That is possible, *but the law does not demand it*. Aside from its equivocal provisions concerning ascertainment of rent or rental value for benefit of the mortgagee, the law requires nothing for the protection of his security. The field is so open and so vast that the admitted impairment of contract obligation is not cured by the declaration that judges may, notwithstanding the law, decree foreclosure if in their judgment equitable. Constitutional guaranties are not satisfied by statutes which make compliance mere matter of grace rather than demandable right. "The constitutional validity of law is to be tested, not by what has been done under it, but by what may, by its authority, be done." Stuart v. Palmer, 74 N. Y. 183, 188, 30 Am. R. 289. "The law itself must save the rights of the parties." Gove v. County of Murray, 147 Minn. 24, 179 N. W. 569.

The law permits outright repudiation for the time being and until May 31, 1935, of contract obligation. The limitation is a suggestion by the legislature of 1933 to its successor of 1935 that the repudiation be extended for another two years or more, as the lawmakers may then decide.

Repudiation of private and public contract debts was the main factor, the most alarming manifestation of chaos and near anarchy, which prevailed increasingly in the American colonies from the end of the Revolution in 1781 to the going into effect of the constitution in 1788. It was the whole animus of Shays' Rebellion in Massachusetts, a disturbance which, although localized, was most alarming. It was distinctly a rebellion of militant debtors against their creditors and against courts and the judges thereof sworn to enforce all law, including the law of contracts.

"Against lawyers and courts the strongest resentments were manifested; and to such a dangerous extent were these dispositions indulged, that, in many instances, tumultuous assemblages of people arrested the course of law, and restrained the judges from proceeding in the execution of their duty." 1 Beveridge, Marshall, 299, quoting 2 Marshall, Life of Washington, 117.

We need not go far in recent local experience for phenomena exactly parallel. Our constitutional system was the cure of the one condition. Surely its abandonment cannot remedy the other. Once the law breaks down, it becomes so much the easier to break it down in other cases where the plainest right requires its enforcement. That process does not continue long before all laws go to smash.

If in economic emergency the legislature may suspend constitutional guaranties and the courts may sustain the suspension whenever *they* think there is reasonable ground and that the suspension does not go too far, we have at once government by proclamation. There will be a pronouncement for each case instead of one law for all. The system will be none the less objectionable because the proclamation emanates from judicial rather than executive sources. It was government by proclamation that lost Charles I his head. It was one of the dangers that the framers of the constitution sought

to save us from in perpetuity, in good times and bad, by inviolable, written guaranties we now hold may be set aside whenever the legislature feels so inclined and the courts can be persuaded to agree that the feeling is justified.

Economic arguments have been much stressed, and very properly, for the economic welfare of our people is the one desideratum of the law. But to my notion that welfare will be hindered ultimately rather than helped by such laws as c. 339. Our western country was largely built into what it is on money borrowed—some from our own people, but much from lenders in other states and overseas. Just now we are sadly in need of rebuilding, and we must rebuild largely on borrowings to be secured by mortgages on our real estate. Just how or from whom can we borrow if we serve notice, as this law does, that foreclosure of mortgages may be deferred indefinitely at the pleasure of officials owing their office to the favor of the debtors? In my judgment economic considerations alone forbid the debtors themselves to resort to repudiation. Such resort will be harmful in proportion as the repudiation takes the form of law and is confirmed by judicial action. That, indeed, would not only impair the obligations of the involved contracts; but would also destroy the confidence of people, even our own people, in the disposition of our community to perform its contracts. Confidence gone in the contract-performing disposition of any community, its prosperity is at an end, for it has divorced itself from that without which business cannot go on—the confidence of people generally in the disposition of people generally faithfully to perform their contractual obligations to the best of their ability. Compare Farrington v. Tennessee, 95 U. S. 679, 24 L. ed. 558.

Mortgages on real estate are held very largely by trustees and quasi trustees. According to the best figures available (those for all our states, of the United States bureau of agricultural economics, as of January, 1928), 10.8 per centum of them are held by commercial and savings banks, 19.1 per centum by the federal and joint stock land banks, and 22.9 per centum by insurance companies. Both banks and insurance companies are quasi trustees, handling

in the latter case the savings of the people put aside for the protection of the insured and their dependents, and in the former the savings and working capital of business and the people generally. In 1928, 29.6 per centum of real estate mortgages were held by individuals, 14.2 per centum by farmers, and 10.6 per centum by retired farmers, that is, by the men and women who to a very large degree made our farms what they are and put into them by way of improvement and cultivation a goodly portion of whatever intrinsic value they have. Discrimination against them now would indeed be a poor sort of encouragement to farmers who naturally must and do look forward to the time when advancing years will compel retirement. Their ambition and their hope for the future will be reduced in proportion as their confidence in their ability to retire on the security, in part, of a mortgage on the home farm is diminished.

In 1930 (*Farm Mortgage Foreclosures in Minnesota,* by E. C. Johnson, University Farm, St. Paul, December, 1932) 53.8 per centum of Minnesota owner-operated farms were reported as mortgaged, leaving 46.2 per centum clear. A substantial portion of mortgaged farms have an encumbrance so well within the owner's capacity to pay that foreclosure is not threatened. Those owners, together with the owners of the clear farms, make up much more than half our farmers living on and operating their own farms. They are entitled to consideration. They are a highly important part of the public, in the interest of which this law professes to operate. That these farmers are economically safe shows that they, by and large, are the best farmers. But they need borrowing power, and what they had is greatly lessened by this law. Sooner or later most of them will desire to sell, but their ability to do so and the value of their land are reduced by this law.

Ordinarily when a farm is sold a purchase money mortgage is taken for a goodly proportion of the purchase price. To the extent that the right of the mortgagee to enforce such a mortgage is impaired a serious obstacle is interposed to renewed movement and consequent increase in value of farm lands. The same consideration

applies, but in less degree, to urban real estate. It is no answer to say that lands may be sold on executory contract, the vendor retaining the legal title—no answer, because if the legislature may impair the obligation of the covenants of a mortgage it may, by the same token and to the same extent, destroy those of the vendee in a contract of sale.

The District of Columbia and New York Housing acts, sustained in Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. ed. 865, 16 A. L. R. 165; Marcus Brown H. Co. Inc. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. ed. 877; Edgar A. Levy Leasing Co. Inc. v. Siegel, 258 U. S. 242, 42 S. Ct. 289, 66 L. ed. 595; Chastleton Corp. v. Sinclair, 264 U. S. 543, 44 S. Ct. 405, 68 L. ed. 841, upon the authority of which the majority opinion stands, were laws providing for the fixing of reasonable rates for the public's use of property, its use of which was necessary at the time being. We have now no scarcity of human habitations, rural or urban. Our present difficulty is just the opposite. Everywhere there is vacancy, more of it probably in our cities than in the country.

As said in a later case, the decisions of the Supreme Court in these rent cases went to the very verge of the law. Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 416, 43 S. Ct. 158, 67 L. ed. 322, 28 A. L. R. 1321. It was suggested in Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. ed. 865, 16 A. L. R. 165, that the United States, in the emergency which followed the world war, was doing only what other countries were doing to protect their people. That would have been apropos if the war powers of congress or the states had been invoked. They were not. The constitutional guaranties against impairment of contract obligation and of due process and equal protection were simply contracted, and the police power stretched, by a bare majority of the court, to sustain the laws. With the utmost deference, I submit that even to suggest that our government may do anything that old world governments may do is to forget that with us all government (not the executive alone, as in England) is restrained by constitutions, the very purpose of which is to bar forever many things which formerly were done by

governments, to the horror of mankind, the oppression of their people, and the destruction of popular rights.

If, as is now contended, the police power may be used as a cover under which the legislative branch of government may, at its will, ignore constitutional guaranties, we have nothing left of our constitutions but parchments of mere historical interest; the bill of rights becomes a mere scrap of. paper. If a contract may be impaired (directly and avowedly as the sole purpose, rather than incidentally as the result of accomplishing some other in the public interest as in the housing law cases) 'and due process or equal protection similarly denied, at the will of any legislature, it is just as logical to hold that in great emergency bills of attainder may be passed and citizens again hanged, drawn, and quartered whenever the lawmaking power so wills. It is no answer to say that mankind has advanced beyond all that. There may be doubt on that point. Our constitutions were framed by men and adopted by people who knew (what so many are prone to forget) that the interests of the masses, particularly those least able to protect themselves, cannot safely be trusted to any government, even our own, unless restrained by the inhibitions which characterize all our constitutions, state and federal. Imprisonment for debt is explicitly prohibited by our state constitution (art. 1, § 12). But in 1887 the legislature of this very state enacted such a measure. If it had not been for the decision here in Meyer v. Berlandi, 39 Minn. 438, 40 N. W. 513, 1 L. R. A. 777, 12 A. S. R. 663, many of those engaged in the building trades might have become victims of the law. It had not occurred to anyone then that the police power doctrine was expansible to infinity.

No thinking man, conscious of the changes wrought and yet to be wrought by progress, can consider our constitutions the ultimate of perfection. They too must change from time to time, in adaptation to accomplished facts of evolution of peoples and government. However, they express some principles which promise to be the ultimate concepts for the restraint of government in the interests of the governed. While so restraining government as to leave a high de-

gree of freedom to individualism, they yet leave in government enough power to prevent individualism from becoming too rugged for the welfare of the masses. They may be amended or entirely done away with if the people so desire. But as long as they stand, no higher duty rests upon government and citizens than obedience to them. To the extent that they need change it should be brought about openly and honestly by amendment rather than by nullification. There can be no more effective and dangerous cover for nullification than the acquiescence of courts in legislation plainly violative of constitutional guaranties. Our experience under the eighteenth amendment demonstrates that the nation as a whole can find no better formula for prolific incubation of disregard of all law, social disorganization, and moral deterioration than the general disregard of constitutional mandates.

Considering as I do that L. 1933, p. 514, c. 339, is violative of constitutional guaranties in the respects indicated and finding myself unable to come to any other conclusion, I respectfully dissent from the decision upholding it.

