# MARY C. SHUMAKER v. F. E. HOOVER.[1]

December 15, 1939.

No. 32,150.

[1]Reported in 288 N. W. 839.

*Carl J. Eastvold* and *Oscar G. Haugland,* for relator.

*F. L. & E. V. Cliff,* for respondent.

JULIUS J. OLSON, JUSTICE.

*Certiorari* brings for review the validity or, in any event, the propriety of an order made by the district court of Big Stone county granting a further two-year extension under our latest moratorium law, L. 1939, c. 7.

The court made extensive findings of fact from which we gather the following: On October 1, 1928, A. L. Shumaker and wife executed a mortgage to Hoover, the present relator, to secure an indebtedness of $18,000, due in installments and bearing interest at seven and one-half per cent per annum payable semiannually. The mortgagors are both deceased, and their rights are now vested in the present petitioners, Mary C. and Ferdinand Shumaker. (Hereafter we shall refer to the owners as mortgagors and to relator as mortgagee.) Several defaults having occurred with respect to principal payments (in all amounting to $3,500), the mortgagee elected to foreclose. The premises were sold at foreclosure sale June 15, 1935, for $18,076.69, the mortgagee being the bidder, and he still holds the sheriff's certificate. So, under the law as it was at the time of the execution of the mortgage, the mortgagors had until and including June 15, 1936, within which to redeem. But no redemption was made. Instead, the mortgagors prior to June 15, 1936, and pursuant to L. 1935, c. 47, petitioned for and secured an extension of time for redemption until March 1, 1937. A second and further extension was granted in March, 1937, pursuant to provisions of L. 1937, c. 21, until

March 1, 1939. The present extension was sought and obtained under the 1939 act, and by the order here for review the period of redemption has been extended to March 1, 1941. The condition upon which this latest extension was granted is that the mortgagors pay to the mortgagee $225 per month to be applied toward taxes, insurance, interest, and, if anything is left over, to the reduction of indebtedness.

The mortgaged property consists of a substantially constructed two-story business building covering three lots in Ortonville. The first floor is divided into two stores, one occupied by J. C. Penney Company under a long-term lease and for which $140 per month is paid as rental. The other store is rented by National Tea Company upon a percentage of sales basis, average rental $120 per month. The second floor is divided into office suites, apartments, and some rooms used for living quarters, including a storeroom. One suite of five rooms is occupied by Mary Shumaker, one of petitioners, and for this occupancy she pays no rent. The court found that "the average rental income from said building at the present time is $450 a month, or an annual income of $5,400." The property is "reasonably worth the sum of $40,000," hence that petitioners have "a substantial equity therein." On the day of sale, June 15, 1935, the total indebtedness against the building was $20,749. At the time of the present hearing this had been reduced to $20,161.92. During the intervening time the property has brought in in the way of cash rental income $17,492.27. The mortgagee has received from the mortgagors out of cash rentals collected by them during that period $5,750. He was required under this and prior orders to apply this income in payment of taxes, insurance, interest, and, if any surplus remained, in reduction of the principal. Crediting all the payments so made to him, the total cost of the property as of time of foreclosure sale, plus what the mortgagee has been required to pay, indicates that the indebtedness as to him has increased $1,440.23.

The balance of the income from the property, so the court found, has been used by the mortgagors in maintaining the prop-

erty, by repairs and improvements of various sorts, and in reduction of "prior indebtedness incurred in the operation of said building, so that the amount of $2,672.31 due on June 15, 1935, has been reduced to $645.42." At any rate, it was found that "said building is now in complete state of repair and in first-class condition without any expense to this respondent" (the mortgagee).

Much is said and numerous cases are cited by counsel in their respective briefs as to the constitutionality of the act under which the present moratorium was granted. It is earnestly urged by the mortgagee (ably opposed by the mortgagors) that the act is violative of U. S. Const. Amend. XIV, as well as Minn. Const. art. 1, § 7; likewise that it violates U. S. Const. art. I, § 10, and Minn. Const. art. 1, § 11.

The decision of the Supreme Court in Home B. & L. Assn. v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. ed. 413, 88 A. L. R. 1481, has furnished the subject matter of many articles, notes, and comments in law reviews and other legal publications. Nor has it been neglected by the press. The following notes and articles, amongst many, furnish interesting and instructive reading: Stone, "Mortgage Moratoria," 11 Wis. L. Rev. 203; 36 Mich. L. Rev. 1379 to 1382, inc.; 23 Iowa L. Rev. 652, 653; 51 Harv. L. Rev. 1292, 1293; 19 Minn. L. Rev. 210; 22 Minn. L. Rev. 1047, 1048; Prosser, "The Minnesota Mortgage Moratorium," 7 So. Cal. L. Rev. 353. The more recent cases bearing upon this phase are: First Trust Co. v. Smith, 134 Neb. 84, 277 N. W. 762; Kansas City L. Ins. Co. v. Anthony, 142 Kan. 670, 52 P. (2d) 1208, 104 A. L. R. 364; First Trust J. S. L. Bank v. Arp, 225 Iowa, 1331, 283 N. W. 441, 120 A. L. R. 932; and the latest (1939) Jefferson Standard L. Ins. Co. v. Noble, — Miss. —, 188 So. 289.

From the record it clearly appears that the mortgagee does not wish to obtain the property if some other reasonable means may be found to liquidate his claim. He has voluntarily reduced the interest rate and has not objected to the prior extensions granted. What he is seeking and has a right to seek is a return of his investment; that there should be an end put to the constantly

mounting increase of the duties assumed by the mortgagors when the obligation was created. There is no manifestation of ill will or of oppressiveness. On the contrary, Miss Shumaker testified:

"Today that mortgage indebtedness has increased to $19,516.92. [The original debt contracted in 1928 was $18,000.] Mr. Hoover, who loaned my parents the money, voluntarily reduced the interest rate one per cent, I suppose to give me a better chance to come out on this building. As far as I know, he doesn't want this property, and he is an old man, about 80 years old, who lives in Illinois. I have no complaint to make so far as Mr. Hoover's attitude personally toward this investment."

With regard to the probability of being able to refinance the loan and what has been done in that behalf she testified:

Q. "Outside of the possible equity that you have in this building, do you have any property or assets?
A. "I have not.
Q. "Do you know if your brother has?
A. "I can't tell you a thing about him.
Q. "Well, then, so far as you personally are concerned, there wouldn't be any liquidation that you would be able to make from the outside to put money into refinancing this indebtedness against this building?
A. "Right.
Q. "That is right?
A. "That is right.
Q. "There is no probability of your getting any money that you could put into this deal?
A. "Not that I know of. * * *
Q. "Now, Mary, at the time of the foreclosure you were in default close to $4,000 on your mortgage, were you not?
A. "As far as I know, yes.
Q. "Now, Mary, this foreclosure, according to paragraph 5 of the petition, this mortgage has been in default since October 1, 1931?

A. "That is right.

Q. "* * * And since that time, up until today, what have you done about finding an outlet, so that you could get refinanced and take up this mortgage indebtedness due Mr. Hoover?

A. "Personally, I tried a personal loan, and we tried through the Reconstruction Finance Corporation.

Q. "You, in other words, have made an honest effort to find an outlet?

A. "Yes. And I also talked to the man at the bank, too.

Q. "And no place were you able to get enough money to take up this loan?

A. "Right.

Q. "Isn't it true that Mr. Hoover agreed to give you a considerable discount, if he could only get his money out of these premises, didn't he offer you a discount?

A. "As far as I know he did. * * *

Q. "(By Mr. Eastvold): It was over $1,000, was it not?

A. "I am sure I couldn't remember.

Q. "But you do remember—

A. "Yes, there was. You talked to me about it.

Q. "And he was willing to give you a substantial discount, if you could only find some outlet and refinance this mortgage?

A. "Right. * * *

Q. "(By Mr. Eastvold): Now, Mary, that offer had been made to you at different times, has it not, more or less of a standing offer?

A. "As far as I took it, Carl, yes.

Q. "Now, these applications that you made for an outlet, Mary, you state that you had no success in getting a loan?

A. "Right.

Q. "Now, Mary, what have you in mind at this time, if a mortgage moratorium is extended to you, as to where there might possibly be an outlet that you now figure will do you some good, where there might be an opportunity to get a loan to refinance this indebtedness? * * *

A. "If the building is rented, fully rented, as it is now, and we get the rent, I don't know why we can't get a loan to refinance it.

Q. "(By Mr. Eastvold): But at the present time, you don't know where that outlet might be?

A. "No, specifically, no."

What has been quoted represents all the proof offered and received upon which capacity to meet this obligation depends and represents all the activities employed to accomplish refinancing. Mary Shumaker's cotenant and brother, Ferdinand, did not testify nor is his absence explained. It should also be remembered that out of the money paid to the mortgagee he has been required to meet and discharge all taxes and insurance upon the mortgaged premises. This amounts to $2,833.06, virtually one-half of the rent money reaching him. As a result the net amount of his investment has increased $1,440.23 since the date of the foreclosure sale.

The obvious purpose of the moratorium act, both as originally passed and as extended by subsequent acts, was to grant distressed mortgagors, for a limited time only, an opportunity to save possible equities in their holdings and that in the meantime they should pay to the holder of the sheriff's certificate the reasonable rental value or income toward meeting the secured obligation. Here we have rental income during preceding moratoria of $17,-492.27, but the net amount actually received by the mortgagee to apply upon his investment was only $2,917.44. More than three years have elapsed since the first moratorium was granted, and more than eight years since the mortgage was in default. During all this time the mortgagors have not found the means with which to reduce this indebtedness, and "specifically no outlet" has been found for a "loan to refinance" the present one. If moratoria are to be granted upon such feeble efforts as are here presented contract obligations need not be of much concern to any mortgagor. We said in Santee v. Travelers Ins. Co. 201 Minn. 66, 69, 275 N. W. 366, 368:

"The moratorium law is intended as a defensive shield to protect owners from *exploitation* by mortgagees or their assigns." (Italics supplied.)

And in The Frissell Co. v. O'Brien, 204 Minn. 398, 401, 283 N. W. 756, 757, it was said:

"Judicial notice should be taken of the fact that borrowing conditions have greatly improved during the past few years, and that, with government home loan and other facilities offered, if the owner of property cannot procure a loan on a tract alleged to be of value far in excess of the mortgage against it, within a period of approximately three years, the value is not there. Every day the purchaser at the foreclosure sale is kept out of possession increases his loss."

Upon the present record we cannot sustain the moratorium granted. The case must go back for a new trial. At such trial careful consideration should be given to the reasonable probability of a refinancing of the indebtedness within a reasonable time, say, for example, four months. In event refinancing seems probable, the mortgagee, during the interim, should receive a net amount out of the rental income of not less than $250 per month. This would still leave $200 per month with which to meet operating expenses, the payment of taxes and insurance.

We note that Miss Shumaker has been occupying a suite of five rooms furnished with heat and that this has been done free from any charge. It also appears that a suite of law offices at $27 per month has not been included as income but has been used by her in the payment of her attorney's fees in this and prior moratoria. The mortgagors must realize that the first claim against this property as between the parties belongs to the mortgagee. Thus far they have been riding as hitchhikers upon the first and prior contract right of the mortgagee. This cannot be tolerated.

The order will be reversed and the cause remanded for further proceedings in conformity with the views herein expressed.

So ordered.

PETERSON, JUSTICE (concurring specially).

I concur in the result.

I think that the statement in The Frissell Co. v. O'Brien, 204 Minn. 398, 401, 283 N. W. 756, that every day the purchaser at the foreclosure sale is kept out of possession increases the mortgagee's loss is dictum that is not in accordance with the fact and should be overruled. The mortgagor's continued possession is often of as much benefit to the mortgagee as to the mortgagor. Such possession results in the preservation and maintenance of buildings, which might otherwise deteriorate and be destroyed, protection of the property, payment of taxes, and other benefits. There is a showing here that the mortgagor's possession was beneficial to both mortgagor and mortgagee during a long period when the building was unrentable. But when the mortgagor obtained a tenant, the mortgagee, who was several hundred miles away and unable to attend to that matter, wanted the possession and the rents.

Furthermore, giving the mortgagee the net rental compensates him for loss of possession. In our decision in the Blaisdell case, 189 Minn. 422, 432, 249 N. W. 334, 86 A. L. R. 1507, we held that application of income to carrying the property and reduction of the mortgage debt "goes far to giving compensation for the extension secured." The Supreme Court of the United States said [290 U. S. 425]:

"While the mortgagee-purchaser is debarred from actual possession, he has, so far as rental value is concerned, the equivalent of possession during the extended period," and [290 U. S. 446] "the relief afforded by the statute has regard to the interest of mortgagees as well as to the interest of mortgagors. The legislation seeks to prevent the impending ruin of both by a considerate measure of relief."

This view was adopted by the Supreme Court of the United States again in Wright v. Vinton Branch Mountain Trust Bank, 300 U. S. 440, 57 S. Ct. 556, 81 L. ed. 736, 112 A. L. R. 1455,

in construing the Frazier-Lemke Amendment to the bankruptcy act (11 USCA, § 203[s]).

While we might take judicial notice that borrowing conditions have improved in recent years, the fact remains that the mortgagors have made ample showing to sustain a finding that conditions in the locality where the mortgaged property is located have not improved so as to make a loan on the property available to refinance the mortgage. The unavailability of loans continued there on account of unprecedented drouth with consequent loss of crops and substantial part of the income of the community, resulting in stagnation of business and stifling of demand for the property so as to make it unrentable.

The trouble with saying that we take judicial notice that borrowing conditions have greatly improved in recent years and concluding from that premise that the mortgagors might have obtained a new loan if there was equity in the property to warrant a loan at all is that the fact to be judicially noticed is directly contrary to the proved facts that borrowing conditions have not improved in the locality where the property involved is situated and that loans are not available there for this particular mortgage. We are confronted with the dilemma of saying that we will notice a fact judicially contrary to what it is actually or holding that judicial notice is only tentative and subject to verification in the particular case. In the first mentioned situation the doctrine of judicial notice should never be applied. In the second, inquiry as to the fact should be permitted. In Ohio Bell Tel. Co. v. Public Utilities Comm. 301 U. S. 292, 57 S. Ct. 724, 729, 81 L. ed. 1093, the latter view was adopted. There the lower court took notice that a decline in prices was a ground justifying the commission's finding of the value of the utilities property for rate-making purposes. The Supreme Court of the United States pointed out that while the court might take notice that there had been a general price decline where the question is involved only collaterally, it could not do so where it involved the very point in issue. Here the situation involves an upturn rather than a

decline. While we might take judicial notice that borrowing conditions have improved generally in a case where the question is involved collaterally, we should not do so where that is the very point involved in the litigation. In the cited case, in speaking of the extent of price declines, the court said that [301 U. S. 302] "no rational concept of notoriety will include these variable elements," and held that when judicial notice is taken it has no other effect than to relieve one of the parties of the burden of resorting to the usual forms of evidence. Certainly that rule makes the doctrine of judicial notice square with actuality and serves to attain rather than obstruct justice. Otherwise, as the court pointed out in the cited case, the rule is in effect a "pretext for dispensing with a trial." See State ex rel. Attorney General v. Norcross, 132 Wis. 534, 112 N. W. 40, 122 A. S. R. 998.

A two-year extension was granted. This, absent a showing other than that stated in the majority opinion, seems excessive. The case should be sent back for the retrial of this one issue.

