ANNIE E. SMITH v. TRAVELERS INSURANCE COMPANY.[1]

April 12, 1940.

Nos. 32,337, 32,338.

*Covell & Root* and *E. V. Molle*, for relator.

*N. R. Ryerson*, for respondent.

HOLT, JUSTICE.

*Certiorari* to review decisions of the court granting respondent an extension of time within which to redeem from the foreclosure of two mortgages under the provisions of L. 1939, c. 7, 3 Mason Minn. St. 1940 Supp. §§ 9633-1 to 9633-21.

Respondent, the owner of lands in Lyon and Redwood counties, this state, in 1925 gave two mortgages thereon to relator to secure the repayment of moneys loaned. Each mortgage was duly recorded. The one was given upon a quarter section in Lyon county and 320 acres in Redwood county; the amount loaned thereon was $23,000. The other was upon 320 acres in sections in Redwood county adjoining those on the east described in the first mentioned mortgage; the amount loaned on this mortgage was $17,500. Hereinafter the first mentioned mortgage will be

[1] Reported in 291 N. W. 516.

designated as mortgage A and the second as mortgage B. It is not necessary further to describe the lands covered except to say that on A were two sets of farm buildings and on B one set. All was under plow except about 20 acres pasture and building sites on each and the ground occupied by open drainage ditches. However, the value per acre was considered slightly higher in B.

Up to 1933 there was no default in the conditions of either mortgage, the five and one-half per cent interest stipulated being paid as well as taxes. But since that date there has been continuous default in the payment of both interest and taxes. By some arrangement between respondent and relator the rent from the several tenants who operated the several tracts of land covered by A and B went to relator and was applied by it upon the interest and taxes. In October, 1938, respondent went to Minneapolis to interview Mr. Waldon, relator's agent or representative in this state, in regard to the situation of these mortgages. According to respondent's testimony on cross-examination, this took place:

Q. "And did you not come to an understanding at that time that the only thing to be done was to allow the Travelers to foreclose the mortgage?

A. "No, they did not want to foreclose.

Q. "You say they didn't want to foreclose?

A. "No.

Q. "But you did tell them that you thought your condition was hopeless, didn't you?

A. "I did at that time, yes.

Q. "Was the mortgage really foreclosed then at your request?

A. "Yes.

Q. "And you have not tried to redeem this land since, have you?

A. "No, I have not.

Q. "As a matter of fact, Mrs. Smith, you know that that would be a hopeless gesture, wouldn't it?

A. "I think so.

Q. "You have no hope of having anybody refinance this loan, have you?

A. "No."

The foreclosure of both mortgages by advertisement was accordingly instituted and sales held on December 31, 1938. The 480 acres covered by mortgage A were bid in by relator for the full amount due and the expenses of the foreclosure, *viz.*: $31,930.63; and the 320 acres covered by mortgage B were bid in by relator for the full amount due thereon and the expense of the foreclosure, *viz.*: $23,519.19. When the hearing upon respondent's petitions for extension of the period of redemption took place September 30, 1939, the amount required to redeem from the foreclosure of mortgage A was $34,334.66 and from that of mortgage B, $24,783.96.

The trial court deemed respondent's equity of redemption in these two mortgages of substantial value. It seems to us the proof is conclusive to the contrary. True, respondent testified that she was of the opinion that the land was worth $100 an acre. As owner, she could express such estimate of value without laying a foundation. On cross-examination she was asked whether that price was the present market value of the land, and she answered: "No, I don't know that it is." Her brother, Mr. Castle, her only other witness as to value, testified on direct: "It should be worth $100 an acre, but at the present time I suppose it would be hard to get that." On cross-examination he testified: "I would say that maybe $60 to $70 an acre is about right. Quite a few [farms] have sold for that. * * * Q. You have not heard within the last few years of any farm selling for $100 an acre, have you, Tom? A. No. I guess we have forgotten all about that price." There may be some doubt whether the $60 to $70 per acre referred to these 800 acres or to the farms he had heard of as being sold in the vicinity. However, the evidence is clear that the value of respondent's farms was about the same as other farms in the vicinity.

Relator produced two men, engaged for years in the real estate business in that locality. Their qualification to testify as to value was so well known to the court that the attorneys were told there was no need to lay a foundation as experts. Of these two, Mr. DeReu gave the value of the 160 acres in Lyon county at $8,000 and of the 320 covered by mortgage A in Redwood county at $18,000, or a total of $26,000; and the 320 acres covered by mortgage B at $20,000. The other witness, Mr. Minnick, estimated the value of the 160 acres in Lyon county at $48 an acre and the 320 acres in Redwood county of mortgage A at $57 an acre or a total of $25,920, and the value of the 320 acres covered by mortgage B at $62.50 an acre or $20,000. Mr. Waldon also testified, his qualification as an expert being well established, that the value of the land covered by mortgage A was $60 an acre, and of that covered by mortgage B, $65 an acre. This gives somewhat higher value than that given by Mr. DeReu and Mr. Minnick, and at such higher value it would have taken $9,508.62 more to redeem the land from these two mortgage foreclosures than the market value thereof on September 30, 1939.

Relator assigns as error granting extension of the time of redemption in each foreclosure because the foreclosures were not inequitable; there was no evidence of value in the mortgaged lands over the amount due and necessary to redeem; the evidence is conclusive that no efforts have been made to redeem; and that an extension of the time for redemption will result in an increased loss to relator with no benefit to respondent.

It is to be noted that L. 1939, c. 7, by its title indicates that its purpose is to grant relief from "inequitable foreclosures of mortgages on real estate." These foreclosures do not come within that designation, for respondent admits that her situation was hopeless and that she requested relator to foreclose. But, that aside, we regard the evidence conclusive that respondent has no equity of redemption of any worth or value in the lands sold under these foreclosures. Indeed, when the applications for extensions were heard, according to the most reliable testimony the

land was worth $9,508.62 less than the sum then required to make redemption. And taking the highest market price which Mr. Castle, respondent's brother, on cross-examination set on these 800 acres covered by the mortgages, *viz.*, $70 an acre, there was a deficiency of $3,108.62 between the market value and the amount required to redeem. Respondent's attorney appears to base a hope of a future rise in value of farm land upon the continuation of war in Europe. This hope is almost as uncertain as would be a speculation as to whether recurrent droughts, hailstorms, and cloudbursts will affect values by diminishing the annual crops. Such speculations upon uncertainties furnish no ground upon which to predicate decisions in respect to the contract rights or equities of litigants.

We are also of the opinion that respondent clearly admitted that she had made no effort either to redeem or refinance either mortgage foreclosure, because she knew it was hopeless to make the attempt. Relator cites in support of its contention that it was error to extend the time of redemption in these foreclosures Bukowski v. Travelers Ins. Co. 196 Minn. 31, 264 N. W. 217; Santee v. Travelers Ins. Co. 201 Minn. 66, 275 N. W. 366; Shumaker v. Hoover, 206 Minn. 458, 288 N. W. 839. We think these decisions sustain relator. Where, as here, the market value of the foreclosed property is many thousand dollars less than the amount necessary for the redemption thereof there is no equity of redemption to protect under the present moratorium act.

Respondent cites no authority in support of the decisions of the court below except Tomasko v. Cotton, 200 Minn. 69, 273 N. W. 628; Prudential Ins. Co. v. Schaefer, 224 Iowa, 1243, 278 N. W. 602; Metropolitan L. Ins. Co. v. Henderson, 224 Iowa, 1238, 278 N. W. 621; Prudential Ins. Co. v. Redmond, 225 Iowa, 166, 279 N. W. 392, 394. The decision in Tomasko v. Cotton, *supra,* determined the rights as between the mortgagee, who had foreclosed his mortgage and bid in the property, and a redemption creditor, a bank. And it was held that the redemption was valid. Only incidentally the abandoned application of defendant Cotton, the

mortgagor, for an extension of the time of redemption was considered. The Iowa moratorium acts are not as to scope or procedure like ours. In that state mortgages are foreclosed by action, and its moratorium acts provide that on application by the mortgagor the action is postponed for a certain time. This excerpt from Prudential Ins. Co. v. Redmond, 225 Iowa, 166, 169, indicates the construction of the Iowa moratorium acts and the practice thereunder:

"The result thereof is that we are confronted with a situation wherein no showing is made as to why a continuance should not be granted, other than a showing that the value of the security is inadequate as compared to the indebtedness owing appellee. It has been uniformly held by this court that the granting of a continuance should be the rule, and that a continuance should be granted unless good cause is shown to the contrary. In so holding this court has only followed the express mandate of the statute, and we have uniformly held that there is no burden upon the applicant to show good cause exists for the granting of the continuance, but that the burden of showing good cause why the continuance should not be granted is upon the party resisting."

Our moratorium acts, as construed by this court, place the burden upon the mortgagor of showing good cause for extending the time of redemption from a foreclosure. Furthermore, not much reliance should be placed upon these cited Iowa decisions, for the moratorium act there involved has now been held unconstitutional, on the ground that where a condition of depression continues for several years the emergency occasioning the exercise of police powers ceases. First T. J. S. L. Bank v. Arp, 225 Iowa, 1331, 283 N. W. 441, 120 A. L. R. 932.

The orders are reversed.

GALLAGHER, CHIEF JUSTICE (dissenting).

I do not agree with the conclusion reached by the majority that the amount required to redeem the premises involved in this proceeding, to-wit, about $60,000, is more than the value of the premises and that the owner has no equity therein. Mrs. Smith,

the owner, testified that the value was $100 per acre. Tom I. Castle, her brother, placed the same valuation thereon. While neither of them could name a purchaser who would pay that amount on the day the case was tried, nevertheless the value on the date of trial is not the test. It appears to me that the majority opinion has misconstrued the testimony of the witness Tom I. Castle in assuming that he conceded on cross-examination that the land was worth from $60 to $70 per acre. If I read his testimony correctly he had reference to other land regarding which he was being cross-examined. I quote from his testimony:

Q. "About your only knowledge of land values is what insurance companies and corporations who own land have been selling their land for, isn't that true?

A. "Yes, that is about all.

Q. "That is about all the knowledge you have of that?

A. "Yes, but I heard of one piece of land that sold for $96 an acre, but I don't know the truth about that.

Q. "That land was not near your farm, was it?

A. "That was near Marshall here somewhere.

Q. "Wasn't that a half section near Windom that the Northwestern Mutual sold?

A. "No, that was out here near Marshall in Lyon county.

Q. "But you don't know definitely which farm it was, do you?

A. "No, I could not say definitely as to that.

Q. "But you have heard a lot more about farms having sold at $55 and $60 and even less than that, than you have of farms being sold at $96 an acre, haven't you?

A. "I would say that maybe $60 to $70 an acre is about right. Quite a few have sold for that.

Q. "Those are all quite well improved farms, aren't they?

A. "Some of them.

Q. "You have not heard within the last few years of any farms selling for $100 an acre, have you, Tom?

A. "No, I guess we have forgotten all about that price.

Q. "And I will ask you whether, if this farm were offered on the market, you think that it would be worth or would sell for $100 an acre at the present time?

A. "No, not today."

The land involved consists of two farms with separate buildings and contains 800 acres. Between 1925 and 1933 Mrs. Smith paid all interest accruing on the mortgages and aggregating about $18,000, almost one-half of the original amount of the loan. She also kept the taxes paid. Since 1933 and because of conditions wholly beyond her control, she became in default in the payment of interest and taxes but otherwise permitted no waste. Since 1933 she turned over to the company all of her share of the rentals except enough to take care of the bare necessities of life. The fact that she may have consented to the foreclosure does not prevent her from seeking the relief asked for herein. In that respect she had no choice and could not have prevented the foreclosure if she wished to do so. This is not a case wherein several applications for extensions have been made and granted. This is the first and only application the owner has made. The trial court's orders require her to turn over to the company all of her share of the crops during the period of extension; that is about all the company will get anyway.

It does not seem to me that there has been any abuse of discretion in granting petitioner's application.

PETERSON, JUSTICE (dissenting).

I concur in the dissent.