# JULIE DOWNING v. INDEPENDENT SCHOOL DISTRICT NO. 9, ITASCA COUNTY.[1]

March 29, 1940.

No. 32,385.

[1]Reported in 291 N. W. 613.

*Marshall B. Thornton* and *James V. Abate,* for appellant.
*Oscar Hallam* and *Bruce J. Broady,* for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiff's suit under our declaratory judgments act to have the court determine and establish her status and rights under her teacher's contract with defendant resulted in findings sustaining her contentions. Upon these judgment was entered later, and defendant appeals.

Plaintiff, a duly qualified teacher, was employed as such by defendant, an independent school district, under a written contract entered into in accordance with the provisions of 1 Mason Minn. St. 1927, § 2903, as amended by L. 1937, c. 161, § 1 (3 Mason Minn. St. 1938 Supp. § 2903), for the school year of 1938-1939. This enactment, generally referred to as the "teachers continuing contract law," so far as here material, provides that a teacher's contract—

"shall remain in full force and effect  *  *  *  until terminated by a majority vote of the full membership of the school board or by the written resignation of the teacher before April 1st. Such termination shall take effect at the close of the school year in which the contract is terminated in the manner aforesaid."

On March 8, 1939, defendant's school board, by a majority vote, adopted the following resolution:

"WHEREAS, *There are pending before the Legislature* of the State of Minnesota, *certain bills which, if enacted into law, would*

*materially decrease the amount of income for said School District for the ensuing years, and*

"WHEREAS, The School Board of Independent School District No. 9, Itasca County, Minnesota, will be unable to determine until on or about the 22nd day of April, 1939, whether such measures will become laws, and

"WHEREAS, Under Chapter 161, Laws of Minnesota for 1937, commonly known as the Teachers Tenure Act, the School Board of said School District must make any changes in teachers' contracts which are to take effect for the next school year on or before April 1st of this year, or must discharge such teachers by terminating their contracts before April 1st, which said contracts would then remain in force to the end of the school year, 1938-1939, and

"WHEREAS, *The said School Board wish in fairness to all of their employees who come under the provisions of said Teachers Tenure Act to make no adjustments in salaries which are unwarranted by the final circumstances which will be determined on the basis of whether or not the aforementioned bills become laws;*

"Now, THEREFORE, BE IT RESOLVED, By the School Board of Independent School District No. 9, Itasca County, Minnesota, at a meeting thereof duly called and legally held in the Nashwauk High School, at 7:00 p. m., on the 8th day of March, 1939, all members being present, *that the assistant superintendent and all teachers now in the employ of said* Independent *School District* No. 9, Itasca County, Minnesota, *be discharged,* effective at the close of the school year of 1938-1939, it being the intent of the said School Board that all teachers and other employees coming within the provisions of Chapter 161 of the Laws of Minnesota for 1937, be discharged so that all such contracts will terminate at the close of the school year in 1939." (Italics supplied.)

That resolution was prepared by the board's counsel, who was present at the meeting, as was also the assistant superintendent of its schools, Mr. Nellis, who was commissioned its representative to communicate the facts in respect of the passage of the men-

tioned resolution to the entire teaching staff, there being 76 of them. On March 13 Mr. Nellis prepared, "by and with the advice of the attorney for the board of education" and pursuant to direction of the board, he having theretofore been "clothed with all authority enjoyed by the superintendent" (who was then ill and later died), a formal notice to the teachers reading as follows, omitting name and address:

"My dear Miss Downing:

"*This is to notify you that because certain bills are pending before the present legislature the Board* of Education *passed a resolution* at its last regular meeting to the effect *that the contracts of all teachers,* principals, librarians, and assistant superintendent *are to terminate at the close of the present school year.* This resolution makes it possible for the Board of Education to make whatever adjustments may be deemed necessary after the legislature closes its work on April 18th.

"*The Board* of Education *wishes in fairness* to all its employees who come under the provisions of the teachers' tenure act *to make no adjustments in salaries* either way *which would not be warranted by the effects of the final action of the legislature.*" (Italics supplied.)

A meeting of the teachers was called by Mr. Nellis, at which time this notice was given to all of them. Naturally there was considerable discussion between Mr. Nellis and the teachers when this matter was brought before the meeting. Some of them wanted to know if the intention was that they should be "fired," and he said, "I wouldn't say we were fired." He told them that they need not be "unduly apprehensive about the meaning of this"; that the resolution mentioned in the notice was "merely a protective measure on the part of the board due to the pending" legislation, "and there was no cause for any uneasy feelings as far as our future jobs were concerned." One witness testified:

Q. "Did you hear that question, as to whether you were fired?
A. "I did.
Q. "What was Mr. Nellis's answer to that?

A. "As I recall it he stated he would not interpret it as such. I think that was further evidenced by the fact none of the teachers applied for new positions."

On April 27 another board meeting was held at which a motion to reëlect all teachers for the ensuing year was lost "by an equally divided vote." At the next meeting, May 10, all board members being present, 70 of the teachers were unanimously reëlected for the ensuing year, but plaintiff and five others were not. At that meeting four of the remaining six teachers on motion to reëlect were unsuccessful "by an equally divided vote." Except as mentioned, no other action has been taken by the board in respect of plaintiff's employment. She is and has been at all times "ready, willing, and able to perform her said contract * * * but has been and is refused permission to do so."

The court thought that "the natural and reasonable interpretation" of the "resolution and notice" was that the pendency of the mentioned legislative bills "would [if enacted] materially decrease" the district's tax income, hence it was "the desire of the school board to postpone" the making of future financial commitments "until after" the threatened legislation had been disposed of. That was the "interpretation and construction" given the resolution and notice by the "assistant superintendent and by this plaintiff and others of said teachers." The bills did not pass; hence the contingency, so the court held, upon which the resolution and notice depended, did not occur. For this reason it was thought that "there has been no determination" by the board "to terminate" plaintiff's employment contract.

At the outset of the trial defendant moved for judgment on the pleadings on the theory that there were no issuable facts involved. Its "contention" was that "the reasons set up in the preamble" of the resolution "are not to be taken into consideration" in its interpretation; "that the only [determinative] portion of that resolution * * * is the resolving clause which clearly states, 'it being the intent of the said school board that all teachers'" within the provisions of the act, "'be discharged so that all such

contracts will terminate at the close of the school year 1939.' "
It therefore seems clear that if defendant's theory is correct it
amounts to a torpedoing of the resolution amidship. Charity
forbids the thought that any such purpose was intended if we
read and consider the whole resolution. Equally so is any notion
that by this wholesale discharge political pressure might be
brought upon the members of the legislature having in hand the
feared enactments. Nor may we impute bad or sinister motives
on the part of counsel or the board to bring about a discharge of
teachers without a clear majority of the board being in favor of so
doing. With these preliminaries in mind and in view of the
fact that there is no question here of the power of the board to
discharge teachers nor of the teachers' right to receive notice of
such discharge before the April 1 dead line is reached, we may
proceed directly to the only question which we think determina-
tive. It is this: Do the facts disclosed by the record justify the
court's finding that there was no valid determination to discharge
the teachers under and pursuant to the 1937 act?

1. The purpose of that act (L. 1937, c. 161) was to do away
with the then existing chaotic conditions in respect to termina-
tion of teachers' contracts. Until then in many cases teachers
would be left in a state of uncertainty as to whether they would
be reëlected for the ensuing year. In many instances this state
of uncertainty ran over a period of months. The later in the
year that a school board acted, the greater the teacher's disad-
vantage in event of discharge to find vacancies elsewhere. That
was the situation sought to be remedied. Under it a dead line
of April 1 was fixed. If no termination had been made prior
thereto and adequate notice given to the teacher, absent mutual
consent by the teacher and the board, the contract continued in
full force and effect.

The resolution itself, if viewed in its entirety, leaves ample room
for the court's view that the termination of the teachers' contracts
here involved depended upon the passage of the feared hostile
legislation. In the light of that statute and the deliberately

298

chosen words of the resolution, is it reasonable to suppose that all teachers were discharged thereby? Would not such wholesale discharge in and of itself be subject to explanations? Surely a school board having in hand the conduct of two large schools employing 76 teachers did not intend to go out of the business of conducting its schools. What, then, motivated this wholesale discharge if it was not fear of inadequate tax income? If the bills did not pass there was nothing on the horizon to indicate justification for any such fear.

If we approach this situation as a practical matter it seems clear, or at least entirely probable, that the pending legislation and its effect upon future tax income were the motivating causes for the resolution. Upon the happening of that event alone depended the outcome. This resolution was prepared by a lawyer, not a layman. We have here a keen, alert, and able lawyer representing the board. His language was chosen with deliberate care. If the board intended to discharge all teachers, and that is what defendant's contention is, then everything said in the inducing, and to the layman compelling, "whereas" clauses was foreign to the discharge purpose and should have been left out entirely from the resolution. Is it not obvious that these were the clauses that naturally and properly appealed to the teachers as sound and compelling reasons for the deferment of final action on the part of the board until legislative adjournment? If in this resolution the inducing "whereas" clauses were expressed in the terms of exceptions or provisos, there could be no doubt that these would amply justify the court's conclusion. 17 C. J. S., Contracts, § 343. Does the fact that the same thought, purpose, and intent appear in the form of "whereas" provisos defeat the obvious plan and purpose? We think not.

2–3. The "cardinal rule" in the interpretation of contracts (and this applies to statutes, ordinances, and the like) "is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles." 12 Am. Jur., Contracts, § 227. The rules of interpretation "are

not inflexible, their purpose being to reach the probable intent of the parties." They "are intended for persons of common understanding." *Id.* § 226. The nature, subject matter, and purposes thereof are to be looked for and ascertained in aid of interpretation. By what name an instrument is labeled is unimportant, for the writing "is not dependent upon any name given it by the parties or upon any one provision, but upon the ,entire body" of the instrument "and its legal effect as a whole." *Id.* § 242. Hence it is that "all contracts must be interpreted with reference to their subject matter." The court in Thomson E. W. Co. v. Peerless Wire Fence Co. 190 Mich. 496, 505, 157 N. W. 67, 70, correctly stated the rule here applicable:

"In construing written agreements the actual undertaking of the parties is to be deduced from the entire instrument, taking into consideration, reconciling, and giving meaning to all its parts so far as possible, including recitals as well as operative clauses, and, when so considered, language which has a distinct meaning standing alone may, in the connection used, become doubtful or its meaning modified by other parts of the instrument, including particular recitals."

Here, as in that case, the recitals were (190 Mich. 502, 157 N. W. 69) "not necessary to a valid" instrument. But defendant selected them and "saw fit to adopt them in framing" its resolution. So electing in framing its resolution, it thereby employed the recitals to "serve as a preface or preliminary statement introducing the subject in relation to which" it was to function. And the court quoted with approval from Torrance v. McDougald, 12 Ga. 526, as follows [190 Mich. 504, 157 N. W. 69]:

"The rule of construction applicable to all writings, constitutions, statutes, contracts, and charters, public or private, and even to ordinary conversation, is this: That general and unlimited terms are restrained and limited by particular recitals, when used in connection with them."

That the recitals in this case are particular, not general, seems obvious.

Of similar import are Duquesne Light Co. v. City of Pittsburg, 251 Pa. 557, 97 A. 85, Ann. Cas. 1917E, 534; Hanly v. Sims, 175 Ind. 345, 93 N. E. 228, 94 N. E. 401. And in Blaisdell v. Home B. & L. Assn. 189 Minn. 422, 249 N. W. 334, 86 A. L. R. 1507, the mortgage moratorium case, this court had for consideration nine "whereas" paragraphs. These recited the facts in respect to the existence of an economic emergency and declared that (L. 1933, c. 339, § 1) "in view of the situation hereinbefore set forth" there was an "economic emergency in Minnesota." The court said (189 Minn. 428, 249 N. W. 336, 86 A. L. R. 1507):

"The main proposition upon which this law must rest is the existence of 'a public economic emergency.' True, the legislature in § 1 of the law declares that it exists, and a preamble of nine 'whereases' seeks further to disclose the necessity for the law."

The court thought that [189 Minn. 429, 430, 249 N. W. 337] "in addition to the weight to be given the determination of the legislature that an economic emergency exists which demands relief," and after recital of many facts of economic history the opinion added: "With this knowledge the court cannot well hold that the legislature had no basis in fact for the conclusion" reached. The Federal Supreme Court in reviewing that case referred to the preambles by saying that:

"Attention is thus directed to the preamble and first section of the statute, which described the existing emergency in terms that were deemed to justify the temporary relief which the statute affords." 290 U. S. 398, 420, 54 S. Ct. 231, 233, 78 L. ed. 413, 419, 88 A. L. R. 1481.

In the case of In re Estate of Fretheim, 156 Minn. 366, 369, 370, 194 N. W. 766, 767, 768, the court was considering the effect of an amendment to a statute of descent of long standing, L. 1917, c. 272, amending G. S. 1913, § 7238(5). The opinion thus summarized the views of the trial court:

"When a statute adopts a part or all of another statute, by specific and descriptive reference, such adoption takes the statute as it exists at that time; and subsequent amendments, or a repeal of the adopted statute, have no effect on the adopting statute. That," said the court, "is an unquestioned rule, but not to be applied where the clear legislative intention is to the contrary."

A discussion of prior laws extending back to territorial days then follows, and the opinion on this phase concludes:

"It is inconceivable that the legislature deliberately chose different methods for the distribution of real and personal property in just one of the many situations covered by the statute, and left the rule the same in all the others.

*"This conclusion is put beyond question by the title of the act of 1917, which is: 'An act to amend section 7238, General Statutes 1913, of the state of Minnesota, relating to the descent of real and personal property.'"* (Italics supplied.)

Likewise, in In re Trust Under Will of Murray, 207 Minn. 7, 12, 290 N. W. 312, 314, a case involving the construction of a will, it will be noted that the court in its opinion refers to "the beginning" of the will and gives effect to what is obviously a mere recital and no part of its operative clauses.

And, surely, it will not be seriously contended by anyone that the preambles of our national and state constitutions are without significance in the interpretation of these our fundamental laws.

So it seems perfectly clear that we should not eliminate from consideration the inducing preambles here presented. They afford adequate explanations for the making of the resolving portion. With these it seems clear that the wholesale discharge of all teachers was far from any thought entertained by anyone connected with this affair.

The language used in the resolution as a whole, the notice given pursuant thereto, the surrounding circumstances, the pur-

poses sought to be accomplished, and the reasons given therefor, not overlooking the interpretation placed upon the resolution and notice by Mr. Nellis, the chosen spokesman for the board,—all these, as stated by the court, "practically force the inference that the finality of the action taken 'will be determined on the basis of whether or not the aforementioned bills become laws.'" And, concluded the court:

"It is just impossible to conceive that a majority of the board intended by the resolution to discharge all the teachers whether or not the bills pending in the legislature became laws. The proceedings of the board after the legislature adjourned, while not conclusive, are inconsistent with that. Indeed, if postponement until after April 1st of decision whether the teachers shall be retained at the same salaries can be upheld in this case, there still remains the requirement of chapter 161 that termination of the contracts by the board may be effected only by majority vote of the full membership; and that has not occurred as to any of the teachers individually."

Hosford v. Board of Education, 201 Minn. 1, 275 N. W. 81, is, by analogy at least, helpful. There the question of the effectiveness of a so-called resignation by the teacher was involved. We said (201 Minn. 3, 275 N. W. 82):

"A resignation of public office is not complete and operative unless there be an intention to relinquish a part of the term, accompanied by the act of relinquishment. [Citing cases.] Intent to relinquish the office or employment, together with the act of relinquishment, constitutes the resignation. Without the intention, a pretended relinquishment is not a resignation." And further (201 Minn. 7, 275 N. W. 84): "The resignation was one in form only. Courts are not concerned with the name and appearance of things but with the reality."

See also Mazaleski v. Hanover Township School Directors, 28 D. & C. 300, 30 Luz. Leg. Reg. 457.

4. It has been suggested that if plaintiff had sought and obtained employment elsewhere she could not be chargeable with breach of contract on the part of the school board; that a contract, to be effective, must be binding on both parties. Accepting that claim at full worth, it is to be noted that under the act a teacher's contract (like any other) may be terminated by mutual consent. This may be done in many ways, just as in any contract. If a school board attempts to discharge a teacher, or if the teacher attempts to resign, contrary to the provisions of the act, such action is in either case ineffective until consent of the other party is obtained. (Estoppel might well enter into such a case, but that problem need not now be considered.) If such consent is obtained then of course that puts an end to the contract. Here there was no mutual consent.

5. We conclude that the record sustains the findings made by the court, hence the judgment entered is right and is affirmed.

STONE, LORING, and PETERSON, JUSTICES (dissenting).

We cannot agree with the views expressed in the foregoing opinion.

The resolution of the school board, quoted in the majority opinion, is unambiguous and definite. It does not need any construction, for its meaning is clear. The discharge of the teachers and assistant superintendent is final. It is expressly stated:

"It being the intent of the said school board that all teachers and other employees coming within the provisions of Chapter 161 of the Laws of Minnesota for 1937, be discharged so that all such contracts will terminate at the close of the school year in 1939."

Well aware, as shown by the resolution, was the district that 3 Mason Minn. St. 1938 Supp. § 2903, was applicable. It is in light of this statute that the resolution was passed, for it alone made such a resolution necessary.

Section 2903 provides that a teacher's contract—"shall remain in full force and effect * * * *until terminated* by a majority

vote of the full membership of the school board or by the written resignation of the teacher *before April 1st.* Such termination shall take effect at the close of the school year in which the contract is terminated in the manner aforesaid." (Italics supplied.)

As stated in the majority opinion, the manifest purpose of the statute was to eliminate the period of uncertainty that many of the teachers were compelled to undergo before it was known whether they were elected for the ensuing year. Delayed action by the board narrowed proportionately the chances of obtaining a school for the following year if discharge occurred. By law, April 1 is an absolute dead line. Either the board must discharge by that date or the teacher is hired for another year. The public policy expressed in this enactment is that while on some occasions school districts may have difficulty if compelled to make discharges before April 1, yet when looked at from a comprehensive viewpoint the desirability of having finality at this date overbalances the interests of the districts. We are not concerned with the wisdom of the enactment. We cannot upset the legislature's determination of a policy which forces the district, irrespective of local problems, to determine its course before April 1. From the viewpoint of the school district, the law may be undesirable, perhaps unwise. It is apparent that the law was enacted for the benefit of the teachers rather than the district.

In view of the fact that by statute the board, despite the local conditions, had no choice but to discharge or hire all teachers by April 1, the exact nature of the resolution of March 8 reflects its true purpose. The necessary and natural procedure, under the circumstances, was to discharge the teachers and then explain by way of recital why it was necessary to take such a course. But these recitals cannot prolong the period of uncertainty of tenure. The law forbids this. The discharge, though explained, is absolute. The resolution is a recognition that under the law there was no alternative to the discharge of all the teachers if the problems created by the local situation were to be solved.

We do not think the clear language can be altered by the "whereas" clauses. They are not part of the resolution and should not be considered as altering its mandate. In Berg v. Berg, 201 Minn. 179, 188, 275 N. W. 836, 842, we quoted with approval from Martin v. Rothwell, 81 W. Va. 681, 683, 95 S. E. 189, 190, as follows:

"It seems to be quite clear that paragraphs in a contract containing recitals of the purposes and intentions of the parties thereto are not strictly speaking parts of the contract, unless adopted as such by reference thereto. The obligations of the parties to each other are not fixed by the terms of these recitals, and the only purpose thereof is to define or limit the obligations which the parties have taken upon themselves where the extent thereof is uncertain, *or to aid in interpreting any ambiguous language used in expressing such obligation.*" (Italics supplied.)

The resolution here is unambiguous and, as we understand the foregoing opinion, would discharge the teachers but for the recitals. The recitals cannot make the clear and definite discharge ambiguous.

The preamble of the resolution is relevant only as a statement of the reasons for the resolution which follows. The effective declaration is "that the assistant superintendent and all teachers now in the employ of said * * * District * * * be discharged, effective at the close of the school year of 1938-1939, it being the intent [hereof] * * * that all teachers and other employees * * * be discharged so that all such contracts will terminate at the close of the school year in 1939."

So the effective declaration of the resolution, thrice repeated, is of intent to discharge the teachers and terminate their contracts as stated. That being so, the reasons stated for the action become immaterial. They are enlightening so far as they show that the purpose of the board was to terminate all pending teachers' contracts in order that they might have a free hand in respect to renewals. The action so taken was of course subject to reëmployment. But so far as reëmployment, or its possibility, is

suggested by the resolution and by the notice thereafter given to the teachers, it was all a matter of intention for the future and not at all a matter of contract right. In short, the contract rights terminated pursuant to the resolution. Thereafter there was nothing left for the teachers except the intention to employ some or all of them as the board might in the future decide, and at rates of compensation to be later determined.

Suppose, as a test, this situation. Had there been a procedure whereby a teacher could, by state authority, be stricken from the roll of eligible teachers for breach of contract, could this present plaintiff, if she had accepted the resolution and notice as a discharge and later taken another position, refusing to go on teaching for defendant, be considered guilty of breach of contract and for that reason stricken from the roll of eligible teachers?

Anything Mr. Nellis had to say to the teachers only went as far as to indicate that the schools had to have teachers and that offers for new contracts would probably be made.

We see no relevancy in either the Fretheim case, 156 Minn. 366, 194 N. W. 766, or the Murray case, 207 Minn. 7, 290 N. W. 312, cited by the majority.

The effect of the foregoing opinion is to violate the purpose of the enactment and render a definite discharge, compelled by statute under the circumstances, a nullity by considering matters and facts recited by way of explanation and not as part of the resolution itself.

This resolution has not been torpedoed. Worse, while undergoing inspection in the dry dock of litigation, it has been destroyed by those whose duty it was to relaunch it in order that its plainly designated home port of purpose could be reached.

We think the judgment should be reversed.