Steven EMERSON, Appellant,

v.

**SCHOOL BOARD OF INDEPENDENT
SCHOOL DISTRICT 199, Inver Grove
Heights, Minnesota, Respondent.**

No. A09–1134.

Supreme Court of Minnesota.

Feb. 1, 2012.

Kevin S. Carpenter, Kevin S. Carpenter, P.A., St. Cloud, MN and Roger J. Aronson, Minneapolis, MN, for appellant.

Margaret A. Skelton, Trevor S. Helmers, Ratwik, Roszak & Maloney, P.A., Minneapolis, MN, for respondent.

Nicole M. Blissenbach, Anne F. Krisnik, St. Paul, MN, for amicus curiae Education Minnesota.

Joseph E. Flynn, Jennifer K. Earley, Knutson, Flynn & Deans, P.A., Mendota Heights, MN, for amicus curiae Minnesota School Boards Association.

## OPINION

DIETZEN, Justice.

Appellant Steven Emerson was employed by respondent Independent School District No. 199 (school district) in Inver Grove Heights, Minnesota, for 3 school years as the activities director, and then for 1 school year as interim middle school principal. Subsequently, the school district terminated Emerson's employment. Emerson filed a grievance on the ground that he was a continuing-contract employee and entitled to continuing-contract rights under Minn.Stat. § 122A.40 (2010). The school district denied the grievance and his subsequent grievance appeals. Emerson filed a petition for writ of certiorari with the court of appeals, which affirmed the decision of the school district. We affirm.

In March 2005 Emerson responded to a posting by the school district for the position of district activities director.[1] The posting stated, among other things, that "[c]andidates must hold a current Minnesota principal license or be in the process of obtaining administrative licensure." At the time of his application and during his employment with the school district, Emerson held a K–12 principal's license. At no time during Emerson's employment did the Minnesota Department of Education (MDE) require a person in the position of activities director to be licensed.

The school district employed Emerson as activities director for 3 school years, from the fall of 2005 to the spring of 2008. Subsequently, an opening occurred for the position of interim middle school principal for the 2008–09 school year, and the school district hired Emerson for that position. In April 2009, the school board voted to not renew Emerson's contract for the 2009–10 school year. The school board did not conduct a hearing or afford Emerson the rights of a continuing-contract employee.

Emerson filed a grievance, arguing that while he was employed as activities director he was a "teacher" within the meaning of section 122A.40, subdivision 1, the continuing-contract statute, and therefore had continuing-contract rights. The continuing-contract statute defines a "teacher" as "a principal, supervisor, and classroom teacher and any other professional employee required to hold a license from the state department." Minn.Stat. § 122A.40, subd. 1. The school board denied the grievance on the ground that Emerson was only a

1. This position is referred to in the record as "District Director of Activities," "Activities Director," and "District Activities Director." For consistency, we will refer to this position as "activities director."

"teacher" when he was employed for 1 year as middle school principal, and therefore was still within the probationary period under Minn.Stat. § 122A.40, and could be terminated at the discretion of the school board.[2] Emerson filed the necessary grievance appeals, which were also denied by the school board. Emerson then filed a petition for writ of certiorari to the court of appeals.

The court of appeals affirmed the decision of the school board that Emerson was not a continuing-contract employee, and therefore the decision to not renew his contract was not an error of law. *Emerson v. Sch. Bd. of Indep. Sch. Dist. 199*, 782 N.W.2d 844, 847 (Minn.App.2010). The court determined that a school district employee is not a "teacher" under the continuing-contract statute, Minn.Stat. § 122A.40, unless the MDE requires a license for the work performed by the employee. *Id.* The court reasoned that the statutory definition of a teacher "unambiguously hinges on state licensure requirements," and because the MDE does not require an activities director to be licensed, Emerson did not qualify as a "teacher" while he was employed as an activities director and was not entitled to the rights of a continuing-contract employee. *Id.* at 846–47. Subsequently, we granted review.

## I.

The question we must decide is whether appellant Steven Emerson's employment by the school district as an activities director falls within the definition of a "teacher" under section 122A.40, subdivision 1, and therefore he is entitled to continuing-contract rights under the statute.

Emerson argues that he qualifies as a "professional employee" under section 122A.40, subdivision 1, because the school district required that he hold a license as a principal to be employed as activities director. The school district counters that whether an individual qualifies as a "teacher" under subdivision 1 depends solely on whether the MDE requires the individual to hold a license for one of the positions enumerated in the statute. Amici curiae Education Minnesota and the Minnesota School Boards Association also urge us to adopt the interpretation proposed by the school district. It is undisputed that an activities director is not required to be licensed by the MDE. It is also undisputed that the school district advertised that an applicant for activities director must either hold a license as a principal, or be in the process of obtaining administrative licensure, in order to be hired to the position of activities director.

**2.** Pursuant to section 122A.40, when a teacher has completed either a 3–year probationary period, or a 1–year probationary period if the teacher has already achieved continuing-contract status in another district, the teacher may only be dismissed for reasons provided within the statute. Minn.Stat. § 122A.40, subds. 5, 7. Moreover, the teacher is allowed certain procedural protections, including a hearing before the school board or an arbitrator. Minn.Stat. § 122A.40, subds. 14, 15.

There is a discrepancy over whether Emerson was required to complete 3 years as a probationary teacher or whether he had already attained continuing-contract status in another district and thus was only required to complete 1 year as a probationary teacher. The court of appeals stated that Emerson "did not complete three probationary 'teacher' years." *Emerson*, 782 N.W.2d at 847. The school district, however, does not deny that Emerson had already attained continuing-contract status in another district, and therefore he needed to complete only 1 year of probationary teaching. Emerson does not address this question, but the answer does not affect our analysis because Emerson was employed by the school district for a total of 4 years, encompassing either period in which to establish continuing-contract status under the statute.

Statutory construction is a question of law that we review de novo. *Premier Bank v. Becker Dev., LLC,* 785 N.W.2d 753, 758 (Minn.2010). The goal of all statutory construction is to effectuate the intent of the legislature. Minn.Stat. § 645.16 (2010). In construing the language of a statute, we give words and phrases their plain and ordinary meaning. Minn.Stat. § 645.08 (2010); *Amaral v. Saint Cloud Hosp.,* 598 N.W.2d 379, 384 (Minn.1999). Thus, if the language of a statute is clear and free from ambiguity, our role is to enforce the language of the statute. A statute is unclear or ambiguous only if it is susceptible to more than one reasonable interpretation. *Am. Family Ins. Grp. v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000).

Minnesota Statutes § 122A.40, subd. 1, provides:

A principal, supervisor, and classroom teacher and any other professional employee required to hold a license from the state department shall be deemed to be a "teacher" within the meaning of this section. A superintendent is a "teacher" only for purposes of subdivisions 3 and 19.[3]

The court of appeals concluded that Emerson was hired by the school district as an activities director, that an activities director is not a "professional employee required to hold a license from the state department," and therefore Emerson was not a "teacher" within the meaning of the continuing-contract statute.

The crux of the dispute turns on the meaning of the statutory phrase "required to hold a license from the state department." It is undisputed that in subdivision 1 the "state department" means the MDE. *See* Minn.Stat. § 122A.40, subd. 1. The dispute centers on what the word "required" means, and what the word "required" modifies. Put differently, a professional employee is "required *by whom*" to be licensed.[4]

---

3. It is important to note that section 122A.40 only applies to school districts in cities that are not "first-class." Minn.Stat. § 122A.40, subd. 18. A first-class city is one having "more than 100,000 inhabitants." Minn.Stat. § 410.01 (2010). Inver Grove Heights is not a city of the first class.

4. Emerson argues that the "required to hold a license" language in section 122A.40, subdivision 1, modifies "other professional employee" and does not modify the other positions specified in the statute, namely the positions of "principal," "supervisor," and "classroom teacher." Emerson cites the grammatical rule of the "last antecedent" that a limiting clause or phrase modifies only the noun or phrase it immediately follows to support his argument. *See Barnhart v. Thomas,* 540 U.S. 20, 26–27, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003); *see also Woodhall v. State,* 738 N.W.2d 357, 361–62 (Minn.2007) (construing statutory language by using the rule of the last antecedent as a "rule of grammar" in conjunction with the "clear language of the statute"). To the extent that Emerson suggests that a "principal," "supervisor," or "classroom teacher" is not required to hold a license to qualify as a teacher under the statute, the argument lacks merit.

In subdivision 1, the Legislature identified two groups of employees: (1) "principal[s], supervisor[s], and classroom teacher[s]," and (2) "any other professional employee[s] required to hold a license from the state department." Minn.Stat. § 122A.40, subd. 1. Specifically, it makes sense that the Legislature did not attach the "required to hold a license from the state department" language to the first group, because every principal, supervisor, or classroom teacher is required by law to hold a license from the department. *See* Minn.Stat. §§ 122A.15, subd. 1, 122A.18, subd. 1. The "required to hold a license" language would have been superfluous if applied to principals, supervisors, and classroom teachers. In contrast, the second category, "other professional employee," includes some positions for which a license is required from the department and others for which no license is required.

More importantly, Emerson's argument is a nonsequitur. Simply stated, Emerson's conclusion that "required to hold a license from the state department" modifies "professional employee" does not resolve the primary dis-

We conclude that the phrase "required to hold a license from the state department" in the statute is susceptible of two reasonable interpretations, and therefore is ambiguous. On the one hand, the broad interpretation proposed by Emerson that "required to hold a license" means required by any person or entity with authority to impose the obligation, including a school district as part of its hiring policy, is reasonable. On the other hand, the narrower interpretation proposed by the school district and amici Education Minnesota and Minnesota School Boards Association is also a reasonable interpretation of the statutory language. The school district and amici contend that the "license" in the statutory phrase "required to hold a license from the state department" is a license not only issued by the state department, but also *required by* the state department. This interpretation recognizes a connection between the authority that

requires the license and the authority that issues the license. The Legislature could reasonably have presumed that since there is a logical connection between issuing a license and requiring a license, that the explicitly identified issuing entity ("from the state department") and the requiring entity were intended to be the same. In other words, the reference to the licensing agency (the state department) in section 122A.40 negated the need for a precursor reference to its licensing statute.[5] That this interpretation of the statutory language is reasonable is bolstered by two factors. First, the Legislature used similar "required to hold a license from" language in Minn.Stat. § 122A.06, subd. 2 (2010) (*"required to hold a license from* the Board of Teaching") (emphasis added), and in that context Emerson's proposed broader interpretation would make no sense. *See infra* pp. 686–87. Second, the school district's narrower interpretation has been consistently used by school districts and amici for decades.[6]

pute between the parties over the meaning of a "professional employee required to hold a license from the state department."

5. The dissent contends that we depart from established methods of statutory interpretation by finding ambiguity in legislative silence and by adding words to the statute. We do not agree that the narrower interpretation is based on silence, in the sense that silence has been addressed in previous cases. Nor do we add words to the statute. Rather, the interpretation draws a logical inference from words that do appear in the statute: the answer to the question "required by whom" is provided by a logical inference from the reference in the following clause to the issuer of the license, the state department. Moreover, even if this were an example of legislative silence, our approach to interpretation is not as rigid as portrayed by the dissent. We have explained:

> [S]ilence in a statute regarding a particular topic does not render the statute unclear or ambiguous unless the statute is susceptible of more than one reasonable interpretation. Put differently, we must resolve whether the statutory construction issue here involves a failure of expression or an

ambiguity of expression. If the legislature fails to address a particular topic, our rules of construction forbid adding words or meaning to a statute that are purposely omitted or inadvertently overlooked. But if the silence causes an ambiguity of expression resulting in more than one reasonable interpretation of the statute, then we may go outside the language of the statute to determine legislative intent.

*Premier Bank,* 785 N.W.2d at 760 (citations omitted) (internal quotations omitted). To the extent that the statute at issue here is silent, that silence causes an ambiguity of expression that results in two reasonable interpretations of the language. The examples cited by the dissent of statutes in which the Legislature has made express cross-reference to another statute are unhelpful because none have a subsequent clause that makes specific reference to a state licensing agency and, implicitly, its licensing authority.

6. The dissent also contends that reference to this long-standing practical application of the statute is an improper reference to extrinsic evidence to create ambiguity. In assessing whether an interpretation of statutory lan-

Because there are two reasonable interpretations, the statutory language is ambiguous. Consequently, we must resolve the ambiguity of whether the statutory phrase "required to hold a license" means "required [by the State licensing authority] to hold a license from the state department," or "required [by the school district] to hold a license from the state department," or both.

When the language of a statute is unclear or ambiguous, we will go beyond the specific language of the statute to determine the intent of the legislature. Minn. Stat. § 645.16. The Legislature has set forth a nonexclusive list of factors we should consider to determine legislative intent. *Id.*

We believe that the most relevant factors in this case are: the purpose of the legislation, the occasion and necessity for the law, the mischief to be remedied, the object to be attained, and the consequences of the interpretations proposed by the parties. *See* Minn.Stat. § 645.16(1), (3), (4), (6).

Minnesota Statutes § 122A.40, which is popularly known as the continuing-contract statute, was enacted in 1937.[7] Act of Apr. 5, 1937, ch. 161, § 1, 1937 Minn. Laws 229, 229–30. The purpose of the continuing-contract statute was "to do away with the then existing chaotic conditions in respect to termination of teachers' contracts." *Downing v. Indep. Sch. Dist. No. 9,* 207 Minn. 292, 297, 291 N.W. 613, 615 (1940). Before enactment of the continuing contract statute, many teachers were

left in a "state of uncertainty" as to whether their teaching contract would be renewed for the next school year. *Id.* To address this problem, the Legislature added statutory language that provided for automatic contract renewal unless the contract was terminated prior to April 1. 207 Minn. at 297, 291 N.W. at 616. Under the statute, if no termination of the contract occurred before April 1, the contract continued in "full force and effect." *Id.* Thus, the statute adopted a uniform standard— April 1—that was applicable to all school districts and teachers. In doing so, the Legislature enacted one unified system applicable to all school districts to avoid the chaotic conditions that resulted from individual determinations by individual school districts.

The school district's proposed interpretation that the licensure requirement to qualify for continuing-contract status must be imposed by the State licensing authority furthers the legislative purpose of having one unified system that is applicable to all school districts. Moreover, such an interpretation avoids the chaotic conditions that result in individualized determinations by hundreds of different school districts. Emerson's proposed interpretation is contrary to the legislative purpose of having one unified system applicable to all school districts.

Notably, the Legislature has promulgated one unified system for the licensing of all qualified teachers. Specifically, Minn. Stat. ch. 122A (2010), sets forth the proce-

---

guage is reasonable, it is not improper to note that the regulated parties have used that interpretation for decades. *Cf. Mattson v. Flynn,* 216 Minn. 354, 358, 13 N.W.2d 11, 14 (1944) ("A member of the present attorney general's staff has written an opinion in conflict with those of his predecessors in office. The fact that able lawyers, after careful study of the provisions of the statute, have taken opposite views as to its meaning supports the

conclusion that the language itself does not explicitly convey the intention of the legislature and that construction is necessary.").

7. In 1937, the continuing-contract statute was codified at Mason's Minn.Stat. § 2903 (Supp. 1940). Subsequently, it was renumbered as Minn.Stat. § 130.18 (1957); Minn.Stat. § 125.12 (1996); and Minn.Stat. § 122A.40 (2010).

dure for principals, supervisors, and classroom teachers to be licensed. *See* Minn. Stat. § 122A.18, subd. 1 (providing that the Board of Teaching must license "teachers" as defined in section 122A.15, subdivision 1, and the Board of School Administrators must license "supervisory personnel" (including principals) as defined in section 122A.15, subdivision 2); Minn.Stat. § 122A.162 (providing that the Commissioner of Education sets the requirements for all other positions within the school system). More importantly, all licenses are issued through the MDE. Minn.Stat. § 122A.18, subd. 1(c). And the MDE has promulgated rules to provide for the licensing of specific positions. *See, e.g.,* Minn. R. 3512.0300, subps. 1, 3–5 (2011) (requiring any individual who serves as or performs the duties of a principal to hold a license); Minn. R. 8710.2000–.5800 (2011) (setting forth the licensure requirements for specific teaching positions). The professional employees required to hold a license from the MDE are enumerated in specific rules promulgated by the MDE pursuant to statute. *See, e.g.,* Minn. R. 8710.5900–.6400 (2011) (setting forth licensure requirements for "other school professionals," including school nurses, psychologists, and social workers).

The broad interpretation proposed by Emerson, and embraced by the dissent, does not support the legislative purpose of one uniform standard for determining continuing-contract status applicable to all school districts. Rather, Emerson's interpretation will create a decentralized system in which hiring policies adopted by individual school districts, including licensure requirements not imposed by the State, as here, will result in hundreds of different continuing-contract standards. This potential for uncontrolled variations in positions through which a person can achieve continuing-contract status is magnified by the possible delegation of hiring standards from a school board to each school principal, or even a faculty-community committee.

Moreover, an individual school district's variation from state-imposed licensing requirements that make a position eligible for continuing-contract status may adversely affect other school districts as well. Specifically, section 122A.40, subdivision 5, provides that after the first 3 years of experience in a qualifying position in one school district, the probationary period in a subsequent school district is only 1 year. Thus, when a prior school district establishes its own standards that qualify for continuing-contract status, the subsequent-hiring school district may be required to grant continuing-contract status in only 1 year to a person who does not qualify by its own standards. Consequently, a subsequent school district could easily determine that the uncertainty created by differing license standards for continuing contract rights among school districts renders it too risky to hire a "transferred" employee and determine within 1 year whether to grant that employee continuing-contract status. Significantly, the net result of the uncertainty created by differing standards is to adversely affect the transferability of state-licensed employees to subsequent school districts. The uncertainty of differing standards among school districts is the type of condition that the statute was intended to avoid.

In contrast, the school district's proposed interpretation, which recognizes a relationship between the authority that requires the license and the authority that issues the license, harmonizes the language of section 122A.40, subdivision 1— "license from the state department"—with the licensing statutes in sections 122A.15 and 122A.18. *See Schroedl,* 616 N.W.2d at 277 (interpreting each section of a statute in light of the surrounding sections "to

avoid conflicting interpretations"). Pursuant to this interpretation, subdivision 1 limits the individuals included within the meaning of a teacher, and does not expand continuing-contract rights to all professional employees the school district may choose to employ. Notably, a school district may impose additional hiring qualifications for the position of activities director, but those additional qualifications are not required by either chapter 122A or an applicable rule promulgated by the MDE. A school district, however, does not have the legal authority under Minn.Stat. chapter 122A to issue a license to professional employees. *Cf. Bd. of Ed. of Minneapolis v. Sand,* 227 Minn. 202, 211, 34 N.W.2d 689, 695 (1948) (stating that a right to tenure cannot be created through representations by a school district when not authorized by statute).

Additionally, the school district's proposed interpretation that recognizes a relationship between the authority that requires the license and the authority that issues the license is supported by other provisions in the continuing-contract statute that implicate state licensing requirements rather than district hiring standards. Section 122A.40, subdivision 3, provides that "[c]ontracts for teaching and supervision of teaching can be made only with qualified teachers." Minnesota Statutes § 122A.16(a) defines a qualified teacher as "one holding a valid license, under this chapter, to perform the particular service for which the teacher is employed in a public school." Thus, a contract recognized under the continuing-contract statute can only be with a qualified teacher, and the definition of qualified teacher requires a fit between the teaching position and the license required by the State licensing authority under chapter 122A, not a license required only by school district hiring policy. The relationship mandated in subdivision 3 between the license required by State law and the position for

which the teacher is hired is consistent with the relationship between State licensure requirements and the teaching position inherent in the school board's interpretation of the language in subdivision 1.

Emerson's proposed interpretation of section 122A.40, subdivision 1, would lead to absurd results. As noted above, the Legislature used similar language in section 122A.06, subdivision 2, by defining teacher to mean "a classroom teacher or other similar professional employee *required to hold a license from* the Board of Teaching." Minn.Stat. § 122A.06, subd. 2 (emphasis added). This definition is "[f]or the purpose[s] of section[s] 122A.05 to 122A.09 ... unless another meaning is clearly indicated." *Id.,* subd. 1. Sections 122A.05 to 122A.09 establish and set out the licensing authority of the Board of Teaching. Applying Emerson's proposed interpretation of section 122A.40, subdivision 1, would lead to results that are absurd and unreasonable. Specifically, defining "teacher" to mean the hiring policies of each school board would make the provisions of sections 122A.05 to 122A.09 almost impossible to execute. For example, section 122A.09, subdivision 4(a), provides that "[t]he board must adopt rules to license public school teachers and interns." The broad interpretation proposed by Emerson would require the Board of Teaching to adopt rules to license any position for which a school board decided to impose a license requirement from the Board. Similarly, section 122A.09, subdivision 4(c), provides that the "board must adopt rules to approve teacher preparation programs." Emerson's interpretation of "required to hold a license" would put in the hands of each school district what position-preparation programs the Board would need to address. In summary, the consequence of Emerson's proposed interpretation of section 122A.40, subdivision 1, applied to section 122A.06, subdivision 2, is that any

professional employee required by any entity, such as a school district, to hold a license from the Board of Teaching is a teacher, and therefore the scope of the Board's responsibilities would be governed by hundreds of individual school districts.

Finally, we observe that the school board's proposed interpretation has been uniformly applied by school districts and teachers' unions for decades. Although this is not an administrative interpretation within the meaning of section 645.16(8), it is not insignificant that these parties operated under this interpretation since the statute was enacted. The consequence of Emerson's proposed interpretation would be to overturn an interpretation that is long-standing.

[5, 6] We conclude that an activities director is not a professional employee "required to hold a license from the state department" and therefore is not a "teacher" within the meaning of the continuing-contract statute. Emerson's proposed interpretation that one entity may require the license (school district) and another entity may issue it is sufficiently reasonable to indicate ambiguity in the language. But the more logical interpretation of the language is to recognize a relationship between the entity that "issues" the license and the entity that "requires" the employee to hold a license. It logically follows that the "required to hold a license" language means a professional employee required by the state licensing authority in chapter 122A to hold a license from the MDE. Our interpretation furthers the legislative purpose of the statute to adopt one unified system applicable to all school districts and avoids the chaotic situations that would result from individualized determinations by hundreds of school districts. Moreover, our interpretation is consistent with the licensing procedures of the MDE, and with related statutes in chapter 122A. Accordingly, we hold that Emerson was not a "professional employee required to hold a license from the state department," and therefore is not a "teacher" under section 122A.40. Minn.Stat. § 122A.40, subd. 1.

## II.

■ Appellant also argues that he should be deemed a continuing-contract employee because "while employed in the Activities Director position [appellant] was performing job duties typically performed by a principal." But appellant makes this argument for the first time in his reply brief to this court. We acknowledge that in his initial brief appellant made a one-sentence reference to his duties as activities director, stating that many of his duties were consistent with employment as a principal. But appellant made no argument in that brief that he should have been considered a "principal" for purposes of section 122A.40 based on those duties. Similarly, in his brief to the court of appeals, appellant referenced his job responsibilities, but did not explicitly argue that those job responsibilities made the activities director position a "principal" position under the statute.

Previously, we have held that we will not address issues raised for the first time on appeal, particularly when the issue is raised in a reply brief. *See George v. Estate of Baker,* 724 N.W.2d 1, 7 (Minn. 2006) (citations omitted). Accordingly, appellant's argument based on his job duties as activities director is not properly before the court, and we decline to address it.

Affirmed.

ANDERSON, PAUL H., J., took no part in the consideration or decision of this case.

STRAS, Justice (dissenting).

The question presented by this case is whether Steven Emerson, who was an employee of Independent School District No. 199 ("ISD–199") for 4 years, was a teacher entitled to the procedural protections granted by statute to continuing-contract employees. The answer to that question turns on the plain and unambiguous language of Minn.Stat. § 122A.40, subd. 1 (2010), which defines the class of "teacher[s]" who are eligible for continuing-contract rights. Here, Emerson is entitled to continuing-contract rights because, under the plain language of subdivision 1, Emerson was a "professional employee required to hold a license from the [Minnesota Department of Education]." Minn.Stat. § 122A.40, subd. 1. Only by adding words to the unambiguous language in subdivision 1 does the court conclude otherwise. Because the court's interpretation of subdivision 1 is inconsistent with the statute's plain language, I respectfully dissent.

I.

Minnesota Statutes § 122A.40 provides rules for the hiring and firing of Minnesota "teacher[s]" employed by school districts that are not located in "first-class" cities.[1] Minn.Stat. § 122A.40 (2010). For "probationary" employees, a school board generally has discretion about whether to renew a teacher's annual contract as the board "see[s] fit." Minn.Stat. § 122A.40, subd. 5(a). A teacher who has completed his or her probationary period, however, is entitled to certain procedural protections, including written notice and a possible hearing, prior to termination of his or her contract. Id., subd. 7. Typically, "[t]he first three consecutive years of a teacher's first teaching experience in Minnesota in a single district is deemed to be a probationary period of employment." Id., subd. 5(a). But for a teacher who has completed a probationary period in another Minnesota school district, "the probationary period in each district in which the teacher is thereafter employed shall be one year." Id.

ISD–199 concedes that Emerson completed a probationary period with another Minnesota school district prior to beginning his employment with ISD–199. Emerson worked at ISD–199 for 3 years as its District Director of Activities ("activities director") and one year as an interim middle school principal. Emerson argues that, because the activities director position falls within the definition of "teacher" in Minn.Stat. § 122A.40, subd. 1, he was entitled to the procedural protections granted to employees who have attained continuing-contract rights, including the right to a hearing before ISD–199 discharged him.[2]

Whether Emerson satisfied the statutory definition of "teacher" is a question of law that is subject to de novo review. See *Larson v. State*, 790 N.W.2d 700, 703

---

1. A "first-class" city has more than 100,000 inhabitants. Minn.Stat. § 410.01 (2010). Inver Grove Heights is not a "first-class" city.

2. Neither party disputes that Emerson was a "teacher" within the meaning of section 122A.40, subdivision 1, when he worked as an interim middle school principal during the 2008–09 school year. Nonetheless, Emerson's single year as a principal was insufficient, by itself, to confer continuing-contract rights because ISD–199 informed Emerson in April 2009 that it did not intend to renew his contract for an additional year. Minn.Stat. § 122A.40, subd. 5(a) (Supp.2011) (allowing the school board to decline to renew a teacher's contract during his or her probationary period, so long as it provides written notice of that decision before June 1). Accordingly, to attain continuing-contract rights under Minn. Stat. § 122A.40, Emerson must show that he was a "professional employee required to hold a license from the state department" in any or all of the 3 years he served as activities director. Id., subd. 1.

(Minn.2010). In interpreting statutes, we "give words and phrases their plain and ordinary meaning." *Premier Bank v. Becker Dev., LLC*, 785 N.W.2d 753, 759 (Minn.2010) (citing Minn.Stat. § 645.08 (2010)). If a statute is unambiguous on its face, then we look no further than the statute's plain language to determine its meaning. *See Hutchinson Tech., Inc. v. Comm'r of Revenue*, 698 N.W.2d 1, 8 (Minn.2005) (citations omitted).

Minnesota Statutes § 122A.40, subd. 1, states in relevant part: "A principal, supervisor, and classroom teacher and any other professional employee required to hold a license from the state department shall be deemed to be a 'teacher' within the meaning of this section." To qualify as a "teacher" eligible for continuing-contract rights under subdivision 1, a school employee must be a principal, supervisor, classroom teacher, or other professional employee. Minn.Stat. § 122A.40, subd. 1. If the employee is a professional employee, then he or she must be "required to hold a license from the state department." *Id.* As the court correctly notes, the "state department" refers to the Minnesota Department of Education ("MDE").

Emerson was a "professional employee," and neither the court nor ISD–199 assert otherwise. A professional is someone "engaged in ... an occupation requiring a high level of training and proficiency." *Webster's Third International Dictionary of the English Language Unabridged* 1811 (2002). ISD–199's job description for activities director stated that Emerson was "responsible for the overall operation of K–12 co-curricular programs of ISD–199." Emerson's job responsibilities included planning and implementing programs for ISD–199; supervising, evaluating, and recruiting coaches and counselors throughout ISD–199; developing and maintaining the activities budget for ISD–199; and reporting directly to the superintendent of ISD–199. The qualifications required for the position emphasized supervisory and leadership experience in school settings. Given the job requirements and correspondingly high level of responsibility for the position of activities director, Emerson's position qualifies as "an occupation requiring a high level of training and proficiency." Therefore, Emerson was a "professional employee" under Minn.Stat. § 122A.40, subd. 1.

The dispute in this case is whether Emerson was "required to hold a license from the state department." It is undisputed that Emerson held three licenses during his employment with ISD–199: a K–12 principal's license, a license to teach English and language arts, and a coaching license. The MDE issued each of Emerson's licenses. Even so, the parties dispute whether Emerson was *"required* to hold a license from the" MDE as activities director for ISD–199. Minn.Stat. § 122A.40, subd. 1 (emphasis added).

The question presented, therefore, is what it means to "require" a license from the MDE. In this context, the meaning of the word "require" is "to demand as necessary or essential." *Webster's Third International Dictionary of the English Language Unabridged* 1929 (2002); *see also The American Heritage Dictionary of the English Language* 1482 (4th ed.2009) (defining "require" as "[t]o call for as obligatory or appropriate; demand"). Implicit in the definition of the word "require" is that the person, entity, or other body making the demand must have the authority to deem something necessary and essential. In other words, a particular qualification or characteristic cannot be "required" unless the entity imposing the obligation has the authority to do so.

In this case, a variety of entities and bodies had the authority to require Emerson to hold a license *from* the MDE. The

Minnesota Legislature has the power to enact statutes requiring licensure, as it has done here for professional employees. By statute, the Board of Teaching "must adopt rules to license public school teachers," Minn.Stat. § 122A.09, subd. 4(a) (2010), and the Board of School Administrators must "license school administrators," Minn.Stat. § 122A.14, subd. 1 (2010). For those positions "not licensed by the Board of Teaching or Board of School Administrators," the MDE "may make rules relating to the licensure of school personnel." Minn.Stat. § 122A.162 (2010). In addition, the school district that hires a professional employee and sets the minimum job requirements for the position also has the authority to "require[ ] a license from the" MDE. After all, it is unquestionably the prerogative of the school district to refuse to hire any employee who does not meet a position's minimum qualifications, as communicated by the school district through its job announcements and position listings.

ISD–199's job announcement stated the following requirement for its activities director position: "Candidates *must* hold a current Minnesota principal license or be in the process of obtaining administrative licensure." (Emphasis added). The position description also required a principal's license for the activities director.[3] As the hiring entity, and unlike certain other groups in the school district, such as a parent teacher association or a student group, there can be no serious argument that ISD–199 lacked the authority to "require[ ]" Emerson to hold a particular license or qualification. ISD–199 made the ultimate hiring decision with respect to the activities director position, and as a result, had the authority to reject candidates who did not meet certain qualifications, such as having a K–12 principal's license. Accordingly, Emerson was eligible for continuing-contract rights under section 122A.40 because he was a "professional employee required to hold a license from the state department."

II.

The court apparently agrees that ISD–199 had the authority to require Emerson, as a professional employee, to "hold a license from the" MDE. Despite ISD–199's unquestioned authority to "require" Emerson "to hold a license from the state department," the court argues that subdivision 1 imposes an additional requirement: the MDE, the Board of Teaching, or the Board of School Administrators must require a professional employee to hold a license from the MDE. The flaw in the court's approach, however, is that subdivision 1 does not hint, much less contain, any language that supports the court's interpretation. Indeed, the plain language of subdivision 1 does not explicitly limit the entities that may require a professional employee to hold a license from the MDE.

---

**3.** The position description for activities director stated in relevant part: *"Must* hold a principal licensure or be in the process of obtaining licensure which must be completed within 24 months from the date of employment." (Emphasis added). Even assuming, as ISD–199 argues, that the position required only that the activities director obtain a principal's license within 24 months of hiring, rather than immediately, Emerson would still be eligible for continuing-contract rights because of his 2 years of continuous service with the school district following that 24-month period. In other words, even if ISD–199 is correct that a principal's license was not strictly required for the first 2 years of Emerson's employment as activities director, he would still have met the statutory definition of "teacher" during his third year as activities director and first year as interim principal because licensure was required for both years. Those 2 years of service would exceed the 1–year probationary period required for continuing-contract rights under Minn.Stat. § 122A.40, subd. 5(a). *See supra* note 2.

Instead of interpreting the statute as written, the court finds an ambiguity through legislative silence and then proceeds to add words to the statute to support its unnatural reading of subdivision 1. In the court's view, the Legislature *really meant* to enact the following statute: "[a] principal, supervisor, and classroom teacher and any other professional employee required *by the State licensing authority* to hold a license from the state department shall be deemed to be a 'teacher' within the meaning of this section." But that is not the statute the Legislature enacted, and the court's strained approach to statutory interpretation finds no support in our case law or in the canons of statutory construction.

First, this court has never found an ambiguity through legislative silence because a statute does not contain a sufficiently comprehensive definition of a term. As we have repeatedly stated, courts may not add words to a statute "that are purposely omitted or inadvertently overlooked" by the Legislature. *Premier Bank*, 785 N.W.2d at 760 (citing *Genin v. 1996 Mercury Marquis*, 622 N.W.2d 114, 117 (Minn.2001)). I can find only two cases in which this court has found an ambiguity through legislative silence: in *Burkstrand v. Burkstrand*, 632 N.W.2d 206 (Minn.2001), and *MBNA America Bank, N.A. v. Commissioner of Revenue*, 694 N.W.2d 778 (Minn.2005), the statutes at issue set forth a specific procedural requirement, but then failed to provide a remedy for violation of the requirement.[4]

Given that subdivision 1 merely defines the term "teacher," the court does not contend—nor could it—that subdivision 1 contains a procedural requirement or is silent regarding a remedy for violation of such a procedural requirement. *See MBNA Am. Bank*, 694 N.W.2d at 782; *Burkstrand*, 632 N.W.2d at 210; *see also Beardsley v. Garcia*, 753 N.W.2d 735, 738–39 (Minn.2008) (discussing *MBNA America Bank* and *Burkstrand*, and rejecting, "especially," the suggestion that silence in the statute at issue created an ambiguity). Therefore, the court's conclusion that subdivision 1 is ambiguous is contrary to our longstanding rule that we may not add words to a statute that "are purposely omitted or inadvertently overlooked" by the Legislature. *Premier Bank*, 785 N.W.2d at 760.

Second, the court is simply wrong that subdivision 1 is ambiguous. In concluding that subdivision 1 is ambiguous through legislative silence, the court fails to point to any ambiguity in the express language of the statute. Instead, the court concludes that subdivision 1 is ambiguous because ISD–199's interpretation "recognizes a connection between the authority that requires the license and the authority that issues the license," and because this interpretation "has been consistently used by school districts and amici for decades." The court apparently concludes, therefore, that the mere mention of the MDE in the text of subdivision 1 means that the MDE is the only entity that may "require" a professional employee to hold a license. The flaw in the court's alternative inter-

---

4. In *Burkstrand*, the statute at issue was silent regarding the consequences of the district court's failure to hold a hearing within 7 days after issuing an order of protection, as required by Minn.Stat. § 518B.01, subd. 7(c) (2000). 632 N.W.2d at 208–10. Because section 518.01, subdivision 7(c), was silent about the "consequences" of a district court's noncompliance with the statute's requirements, we concluded that the statute was ambiguous. *See Burkstrand*, 632 N.W.2d at 210. Similarly, in *MBNA America Bank*, we declared a statute ambiguous when it required the Commissioner of Revenue to provide certain information in assessment notices mailed to taxpayers, but provided no remedy for the Commissioner's noncompliance with that procedural requirement. *See* 694 N.W.2d at 779–82.

pretation of subdivision 1, however, is that it is flatly inconsistent with the plain language of the statute.

The fact that subdivision 1 explicitly references the MDE tells us only that Emerson must be required to hold a license *"from"* the MDE—a fact compelled by the text of the statute and not disputed by anyone—not that Emerson must be required to hold a license *by* the MDE. To find an ambiguity, the court must therefore alter the text of subdivision 1 as follows: "any other professional employee required [by the State licensing authority] to hold a license from the state department." That alternative interpretation is unreasonable, however, because the statute does not include the bracketed phrase added to the statute by the court: "by the State licensing authority." It is axiomatic that a court may not create a statutory ambiguity by changing the plain text of an otherwise unambiguous statute. To hold otherwise would mean that we could deem any statute ambiguous once we conceive of alternative language that the Legislature could have included in the statute. *See Laase v.2007 Chevrolet Tahoe,* 776 N.W.2d 431, 438 (Minn.2009) (stating that this court "cannot rewrite a statute under the guise of statutory interpretation" by substituting words in the statute (citation omitted)); *Beardsley,* 753 N.W.2d at 740 (rejecting an invitation to rewrite the text of a statute in order to find ambiguity because "[t]he prerogative of amending a statute in such a fashion belongs to the legislature, not to this court").

Third, the court contravenes case law by using extrinsic evidence to conclude that subdivision 1 is ambiguous. Specifically, the court relies on the fact that its alternative interpretation is consistent with "decades" of interpretation and practice by school districts. Even aside from the fact that there is no evidence in the record to suggest that school districts have consis-

tently interpreted subdivision 1 to mean that only the licensing authorities may require a professional employee to hold a license, we have repeatedly held that it is improper to resort to extrinsic evidence to find a statutory ambiguity. *In re Welfare of R.S.,* 805 N.W.2d 44, 52 (Minn.2011) ("[E]xtrinsic evidence can be used only to resolve existing statutory ambiguity; it cannot be used to create ambiguity where none exists."); *Reiter v. Kiffmeyer,* 721 N.W.2d 908, 911 (Minn.2006) ("[U]se of extrinsic aids to determine legislative intent where there is no ambiguity in the express language of the statute would be unnecessary and improper."). Here, the court improperly bootstraps extrinsic, historical evidence of custom and practice into its finding of ambiguity, and then relies on that same extrinsic evidence to conclude that its alternative interpretation of the statute is the more reasonable one. Such an analysis deviates from our traditional approach to statutory interpretation.

In sum, the court's opinion represents a radical departure from traditional methods of statutory interpretation. The court finds an ambiguity through legislative silence in a novel circumstance, the court adds words to a statute to create an alternative interpretation of an otherwise unambiguous statute, and the court resorts to extrinsic evidence to support its conclusion that the statute is ambiguous. In my view, the court concludes that subdivision 1 is ambiguous by creating a false dichotomy: either (1) the Legislature intended to include the phrase "required by [*the school district*] to hold a license"; or (2) the Legislature intended to include the phrase "required by [*the State licensing authority*] to hold a license." But the court apparently overlooks a third alternative: the statute means exactly what it says and the Legislature failed to include any language qualifying who or what may require a school employee to hold a license from

the MDE.[5] I would adopt that third interpretation, which gives effect to the plain and unambiguous language of subdivision 1 without adding words to the statute or otherwise modifying the statutory text.

## III.

In this case, the statute at issue requires Emerson to show: (1) that he is a "professional employee"; and (2) that he was required to hold a license issued from the MDE. Minn.Stat. § 122A.40, subd. 1. By satisfying both statutory requirements, Emerson is entitled to continuing-contract rights. Accordingly, I would reverse the decision of the court of appeals and remand this case to the school board of ISD–199 for further proceedings consistent with this opinion.

PAGE, J. (dissenting).

I join in the dissent of Justice Stras.

---

**5.** Section 122A.40 does not hint, much less provide, a limitation on who may require a teacher to obtain a license from the MDE. Notably, in a number of other statutes, the Legislature has explicitly cross-referenced a certain chapter or statutory provision when it intends to limit or delineate the scope of a particular statutory requirement. *See* Minn. Stat. § 60A.08, subd. 12 (2010) (stating that commercial automobile policies "must provide coverage for rented vehicles *as required in Chapter 65B*" (emphasis added)); Minn. Stat. § 62E.06, subd. 4 (2010) (describing that a health maintenance organization is a number three qualified plan if it provides services *"required by Chapter 62D"* (emphasis added)); Minn.Stat. § 79.34, subd. 5 (2010) (referring to insurance *"required by chapter 176"* (emphasis added)); Minn.Stat. § 116.073, subd. 1(a)(3) (2010) (explaining Pollution Control Agency staff and Department of Natural Resources Conservation officers can issue citations to a person who "fails

to take discharge preventive or preparedness measures *required under chapter 115E"* (emphasis added)). And in statutes relating to education, the Legislature also has been explicit when it intends to incorporate the requirements of a particular chapter or statute in delineating the obligations imposed by another statute. *See* Minn.Stat. § 123A.79 (2010) (establishing a "joint powers board" for districts and stating that notice of regular and special meetings must be given *"as required under Chapter 13D"* (emphasis added)); Minn.Stat. § 126C.63, subd. 4 (2010) (defining a "[d]ebt service fund" as aggregate of funds maintained by school districts for paying off principal and interest *"as required by Chapter 475"* (emphasis added)). The fact that the Legislature has not similarly limited the scope of subdivision 1 by including an explicit cross-reference to statutes discussing the duties of the state licensing authorities undermines the court's interpretation of the statute.